UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

EMMANUEL TORRES,

Defendant.

24 Cr. 474 (CM)

**GOVERNMENT'S SENTENCING MEMORANDUM**

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin A. Gianforti
Assistant United States Attorney
 -Of Counsel-

**Table of Contents**

I.    Background ......................................................................................... 2

    A.    Offense Conduct ......................................................................... 2

        1.    KCM Status and Money Transmission Laws.............................. 2

        2.    CW-1's MLO .................................................................... 3

    B.    Procedural History ..................................................................... 5

    C.    The Sentencing Guidelines ......................................................... 6

    D.    Prior Sentencings in this Matter ................................................. 6

II.    Argument ............................................................................................ 8

    A.    The Governing Legal Framework ................................................. 8

    B.    The Court Should Impose a Sentence of 3 Months' Imprisonment ...... 11

        1.    The Nature and Seriousness of the Offense, and the Need
            to Provide Just Punishment .......................................... 11

        2.    The Need to Promote Respect for the Law and to Afford
            Adequate Deterrence .................................................... 13

        3.    The History and Characteristics of the Defendant .................... 14

III.    Conclusion .......................................................................................... 15

For a period of at least 3 years, former flight attendant Emmanuel Torres moonlighted as a money mule for an international money laundering operation ("MLO") that funneled drug money from New York City to the Dominican Republic. As a flight attendant for Delta Airlines ("Delta"), Torres was the perfect mule because he had "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allowed him to slip through airport security in the dedicated KCM lane at JFK International Airport ("JFK") with little to no scrutiny. In exchange for a few percentage points on each money run, Torres would smuggle bulk cash generated from local narcotics sales through airport security and then hand it off to another member of the MLO in the Dominican Republic. He did this repeatedly, apparently never stopping to consider that he was fueling the scourge that is the international drug trade. He was part of a network of flight attendants who did this for the MLO, and only stopped in 2022, not because of a change of heart, but because that was the last time that the Government directed the cooperating witness who ran the MLO ("CW-1") to ask Torres to move money for him.

The United States Probation Office ("Probation") calculates the sentencing Guidelines applicable to Torres as 18 to 24 months' imprisonment, and recommends a below-Guidelines sentence of 366 days' imprisonment. Torres asks for even greater leniency in seeking a sentence of time served, plus a period of supervised release. Though the offense conduct at issue here was very serious, the Government respectfully suggests a middle path of a short sentence of 3 months' imprisonment, to be followed by 3 years' supervised release, due to the unique mitigating factors relevant

to this defendant. Such a sentence is well supported by the record and would be sufficient but not greater than necessary to serve the ends of Section 3553(a).

## I.    Background

### A.    Offense Conduct

#### 1.    KCM Status and Money Transmission Laws

Large-scale narcotics suppliers who ply their wares in the United States often end up with the problem of having a significant amount of cash on hand in the United States that they would like to have access to and spend back home. (PSR ¶¶ 9-11). Unable to reliably use traditional banks to wire this cash out of the country, for fear of detection and interdiction, drug dealers often come up with more creative ways of getting their money into their pockets. (*Id*.) One common tactic favored by drug dealers based in the Dominican Republic is to enlist flight attendants who work routes between the United States and the Dominican Republic to smuggle large quantities of cash out of the country in exchange for a small percentage of the proceeds smuggled. (*Id*.). In one key respect, flight attendants make ideal money mules: they typically benefit from KCM status with the TSA, which in most cases allows them to breeze through airport security via a dedicated lane without being meaningfully searched. (PSR ¶¶ 12-16). The defendant had KCM status at all relevant times. (PSR at 26).

Transmission of funds in this way, without a license to do so, is a criminal offense under federal law and the laws of the State of New York. *See* 18 U.S.C. § 1960; N.Y. Banking Law §§ 641, 650. The reason for this is simple: U.S. and New York State authorities seek to disrupt the flow of criminal proceeds just like those at issue here.

Licensees are required to, among other things, report suspicious financial activity to relevant authorities as a means of aiding the detection of the movement of funds derived from criminal activity. Under federal law, a money transmitter must obtain a license from the Financial Crimes Enforcement Network, a division of the U.S. Treasury. (*See* PSR ¶ 18). Under New York law, a money transmitter must obtain a license from the New York State Department of Financial Services. (*See* PSR ¶ 17). Torres has never held a federal or state license to operate a money transmission business. (PSR ¶ 20).

### 2.    CW-1's MLO

In October 2021, the Government charged an individual ("CW-1") with money laundering and narcotics offenses in connection with CW-1's operation of the MLO into which CW-1 recruited Torres in or about 2015. (PSR ¶ 21). CW-1 began cooperating with law enforcement soon after being charged and helped the Government build a case against Torres and other flight attendants that CW-1 used to move drug money from New York City to the Dominican Republic. CW-1 has moved millions of dollars for drug dealers in the Dominican Republic. These dealers are known to traffick in, among other things, fentanyl. (PSR ¶ 9). CW-1 personally sold significant quantities of oxycodone, some of which was laced with fentanyl, to undercover agents prior to being charged.

Over the course of the approximately 3 years that Torres moonlighted as a money mule for CW-1's MLO, CW-1 estimates that Torres smuggled at least $1.5 million in narcotics proceeds out of the United States at CW-1's direction. (PSR ¶

3

21).[1] The Government estimates, and Torres agrees (Dkt. 37 at 4), that Torres earned thousands of dollars from this side hustle, based on CW-1's estimates of the total amount of cash Torres smuggled and the low percentage-point fee Torres charged for this service. Torres knew he was moving drug money. (PSR ¶¶ 21-23).

On or about April 28, 2022, Torres proactively reached out to CW-1 to let CW-1 know that Torres was scheduled to work an upcoming flight from New York City to the Dominican Republic. (PSR ¶ 22). On or about May 28, 2022, Torres followed up with CW-1 about the upcoming flight, asking whether CW-1 had any narcotics proceeds ("lotions") that CW-1 needed moved to the Dominican Republic. (*Id.*). At the direction of law enforcement, CW-1 responded to Torres and apologized for not having any narcotics proceeds to move at that particular moment because CW-1's narcotics-dealer clients had not come to CW-1 with any money recently. (*Id.*).

On or about June 12, 2022, knowing that Torres was back in the muling business, CW-1, at the direction of law enforcement, reached out to Torres to see if Torres had any upcoming flights to the Dominican Republic. (PSR ¶ 23). Torres confirmed that he was working a flight to the Dominican Republic on June 21, 2022. (*Id.*). CW-1 told Torres in response that CW-1 would start asking his narcotics-dealer clients to gather their cash for the upcoming run. (*Id.*).

---

[1] The Government understands that Torres disputes this estimate from CW-1. (*See* Dkt. 37 at 3-4). Whatever the particulars of Torres's involvement in the MLO, there is no dispute that Torres abused his KCM status by running drug money for CW-1 numerous times over several years and indeed went back to muling money after an apparent fallow period. (Dkt. 37 at 4).

4

On or about June 21, 2022, at the direction of law enforcement, CW-1 arranged to meet with Torres in Brooklyn to hand off approximately $60,000 in law enforcement funds that CW-1 represented to be the proceeds of narcotics trafficking. (PSR ¶ 24). During their meeting in Brooklyn, CW-1 and Torres talked about how the MLO's business had been slow and CW-1 handed over the $60,000. (*Id.*).

On or about June 22, 2022, Torres flew to the Dominican Republic with the $60,000 and handed over the funds to another cooperating witness, less Torres's $2,100 fee. (PSR ¶ 25). The rest of the cash was returned to law enforcement. (*Id.*).

## B.    Procedural History

On April 30, 2024, United States Magistrate Judge Sarah L. Cave issued a criminal complaint charging Torres with operation of an unlicensed money transmission business, in violation of 18 U.S.C. §§ 1960 & 2; conspiracy to operate an unlicensed money transmission business, in violation of 18 U.S.C. §§ 371 & 1960; bulk cash smuggling, in violation of 31 U.S.C. §§ 5332 & 2; and entering an airport or aircraft area in violation of security requirements, in violation of 49 U.S.C. §§ 46314(a) and (b)(1). Torres was arrested on May 7, 2024, and presented the next day before United States Magistrate Judge Gary Stein. Torres was bailed and has been on pretrial supervision since his arrest, with no issues complying with the terms of his release.

On August 12, 2024, Torres pleaded guilty before United States Magistrate Judge Sarah L. Cave, pursuant to a plea agreement, to an information charging him with a single count of violating 18 U.S.C. §§ 1960 & 2, in connection with his involvement in CW-1's MLO. Earlier today, the Court accepted the guilty plea. (Dkt. 38).

### C.    The Sentencing Guidelines

The Government and Probation arrived at the same Guidelines calculation in this matter: a base offense level of 14, pursuant to U.S.S.G. § 2S1.1(a)(2); a six-level enhancement because the defendant knew that the laundered funds were the proceeds of narcotics activity, pursuant to U.S.S.G. § 2S1.1(b)(1); a three-level deduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a)-(b); and a further two-level deduction under the Zero-Point Offender Guideline, pursuant to U.S.S.G. § 4C1.1(a), for a total offense level of 15. Torres has no criminal history and therefore is in Criminal History Category I. His stipulated Guidelines Range under the plea agreement is 18 to 24 months' imprisonment. (*See* PSR ¶ 3).

### D.    Prior Sentencings in this Matter

On December 20, 2024, United States District Judge Ronnie Abrams sentenced Charlie Hernandez, another flight attendant CW-1 used to transfer drug money from the United States to the Dominican Republic, to 3 months imprisonment.[2] *See United States v. Hernandez,* 24 Cr. 447 (RA). On February 21, 2025, United States District Judge Arun Subramanian sentenced Jarol Fabio, yet another flight attendant CW-1 used in CW-1's MLO, to 3 months' imprisonment, as well. *See United States v. Fabio,* 24 Cr. 481 (AS).[3]

---

[2] A copy of the transcript of that proceeding is attached here as Exhibit 1. References thereto use the designation "Abrams Tr.__."

[3] A copy of the transcript of that proceeding is attached here as Exhibit 2. References thereto use the designation "Subramanian Tr.__."

On January 30, 2025, United States District Judge Naomi Buchwald sentenced Sarah Valerio Pujols, a third flight attendant from CW-1's MLO, to time served and one year of supervised release. *See United States v. Valerio Pujols*, No. 24 Cr. 442 (NRB).[4]

### 1.    Charlie Hernandez

In sentencing Hernandez, Judge Abrams noted that the 3553(a) factors that were most critical to her reasoning were "general deterrence and recognizing the seriousness of the crime." (Abrams Tr. 18).

With respect to the seriousness of the offense, Judge Abrams noted, among other things, that far from being an isolated "short lapse in judgment….this was five years, with the government estimating that [Hernandez] laundered approximately two and a half million dollars, even if he only received a small portion in return. And he only stopped because he saw someone else [the defendant] get arrested." (Abrams Tr. 21). Judge Abrams also focused on the fact that Hernandez had moved funds linked to the international fentanyl trade, which "cause[s] real harm to real people," noting that she had "had a number of cases since [becoming] a judge where people have died of fentanyl overdoses." (Abrams Tr. 21-22). "[T]hese organizations can't function without getting their proceeds…and you helped in that process. And, as I

---

[4] The Government charged one other flight attendant as part of its takedown of CW-1's money mule network: Johanna De Jesus. She has also pleaded guilty to a Section 1960 charge, pursuant to a plea agreement. De Jesus is currently due to be sentenced by United States District Judge Edgardo Ramos on March 20, 2025. *United States v. De Jesus*, No. 24 Cr. 577 (ER).

said, you didn't do it for a week or two weeks or even a year. You did it for five years."
(Abrams Tr. 22).

With respect to the need for general deterrence, Judge Abrams noted that she
thought a 3-month term of imprisonment would result in real "deterrence within this
community of flight attendants and others who work in that industry." (Abrams Tr.
23; *see also* Abrams Tr. 16-17, 29).

### 2.    Jarol Fabio

In sentencing Fabio, Judge Subramanian, like Judge Abrams, emphasized the
seriousness of the offense given its connection to the international fentanyl trade,
which "each year takes the lives of tens of thousands of people." (Subramanian Tr.
32). Judge Subramanian also agreed with Judge Abrams that, with respect to general
deterrence, "we have a small community of people who are uniquely in a position to
be influenced by what happens to their colleagues, and if there is a way of stopping
some of this money from going through these channels, if there is a way to slow the
drug trade, this trade that's killing tens of thousands of Americans each year, then
that's one of the purposes that Congress says I have to consider." (Subramanian Tr.
32-33).

## II.    Argument

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United
States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d
Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held
also that the Guidelines remain in place and that district courts must "consult" the

Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 200, 204 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)); *see also, e.g., United States v. Solis*, 18 F.4th 395, 405 (2d Cir. 2021) ("District courts are to use the Guidelines as a 'starting point' and then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant' and all other statutory factors.").

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6);[5] and "the need to provide restitution to any victims," 18 U.S.C.

---

[5] Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). Because Section

§ 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007),

---

3553(a)(6) was intended to address national disparities, "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)." *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)). By this same logic, this Court may—but is not required to—consider sentencing disparities with other defendants in this District.

10

and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## B.    The Court Should Impose a Sentence of 3 Months' Imprisonment

A sentence of 3 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, the need to avoid unwarranted sentencing disparities among defendants, and the history and characteristics of the defendant. A balance of these factors weighs in favor of the Government's recommended sentence, and against the undue leniency the defendant seeks through his request for a non-custodial sentence.

### 1.    The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of the offense and the need for just punishment warrant a term of imprisonment. The international drug trade, and particularly the international trade in opioids like fentanyl and oxycodone, is a scourge in the United States. The opioid epidemic in this country has been well documented and has led to many, many destroyed lives, violence, and obscene wealth for large-

11

scale traffickers like those that made up CW-1's client base. Torres was just a small

part of this, but was nonetheless a vital pipeline for the money that keeps this drug

trade running and profitable. He knew what this money was and he smuggled it out

of the country again and again and again. He could have found other ways to make a

little extra money if he needed it, but, no, he decided to go into the money muling

business. Indeed, he appears to have paused for a period of time, but ended up going

back to his criminal conduct even after having a period of time to reflect. (Dkt. 37 at

4). Thanks to him, some drug lords in the Dominican Republic are that much richer.

     What makes matters worse is that Torres abused a position of trust bestowed

upon him as a flight attendant with KCM status.[6] Torres knew that he could breeze

---

[6] In preparing the PSR for defendant Sarah Valerio Pujols, as well as the other flight attendants charged in connection with CW-1's MLO, Probation asked the Government whether it felt the abuse-of-trust enhancement was appropriate on the facts presented here. The Government initially agreed that the enhancement would be appropriate, but, upon further consideration, no longer does. Probation did not include the enhancement here. (*See* PSR ¶¶ 37-46, at 23).

U.S.S.G. § 3B1.3, Application Note 1, makes clear that the enhancement is principally intended for defendants who hold positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." The examples provided by the Guidelines Commission include those with certain duties of care, such as an attorney embezzling funds from a client for whom the attorney is acting as a legal guardian, "a bank executive's fraudulent loan scheme," or "the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." While the enhancement may appear applicable based on the defendant's violation of the position of trust she was conferred through her KCM status, the Government's position is that a flight attendant falls closer to the bank teller/hotel clerk-end of the spectrum than the attorney/bank executive/doctor-end of the spectrum, and therefore the enhancement does not apply. The Government discussed its position with Judge Abrams at Hernandez's sentencing and, although she agreed that there had been a clear abuse of the trust in a more general sense, she ultimately did not apply the enhancement. (*See* Abrams

through airport security at JFK with little to no scrutiny. After CW-1 approached him, he learned that this access could be monetized, which he did over and over again—indeed, even proactively reaching out to CW-1 in or about April 2022 to see if CW-1 needed any money moved. (PSR ¶ 22). Airports are in many ways the front lines of national security and law enforcement in this country. They have a unique role in helping to screen and disable potential threats and criminal activity. Torres thumbed his nose at all of that to make a few bucks.

All of these reasons support a sentence of 3 months' imprisonment.

### 2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a sentence that includes a meaningful term of imprisonment. Again, Torres was well aware of the special access to airports that he was granted by virtue of being a flight attendant with KCM status. But he treated that access like an ATM card, demonstrating a profound disrespect for the law.

While the Government agrees in large part with the defense that the defendant has likely been sufficiently specifically deterred from doing anything like this again, there is still a need for general deterrence here. The Government's arrest of the defendant and the other flight attendants was well-covered in the press and the Government hopes that U.S. airlines have started to make changes to address the risk of

---

Tr. 4, 8-9). Neither Judge Subramanian nor Judge Buchwald applied the enhancement, either.

abuse that comes along with KCM status. But there is nonetheless a need to demon-
strate that this kind of abuse comes with serious consequences, including jail time.
The risk is that a slap on the wrist like a period of supervised release will not funda-
mentally change the calculus for others with KCM status: if people have been slipping
through the net for so long, and can easily make extra money, those with KCM status
may conclude that it is more than worth the risk of facing a short period of supervised
release. The calculus should be that rolling these dice could land you in jail, with no
prospect of employment in the airline industry on the other side. Judge Abrams and
Judge Subramanian rightly acknowledged this; Judge Buchwald did not.

### 3.    The History and Characteristics of the Defendant

The history and characteristics of the defendant are uniquely mitigating and
weigh in favor of a 3-month term of imprisonment, rather than a Guidelines range
sentence or even the 10 months suggested by Probation. But they are not so uniquely
mitigating as to warrant a non-custodial sentence out of sync with Judge Abrams' 3-
month sentence for Charlie Hernandez and Judge Subramanian's 3-month sentence
for Jarol Fabio.

There were similar mitigating considerations for Hernandez and Fabio, includ-
ing, among other things, histories of physical and emotional abuse on account of their
sexual orientation, consistent employment, and serious mental health issues, partic-
ularly in the case of Hernandez. Torres, like Hernandez and Fabio, is also childless;
by contrast, Sarah Valerio Pujols' young child and caretaking requirements appear
to have weighed heavily in Judge Buchwald's analysis.

The Government's substantially below-Guidelines recommendation of 3 months' imprisonment accounts for these mitigating facts and is an appropriate disposition in light of these personal characteristics and the other 3553(a) factors.

## III.    Conclusion

For the reasons set forth above, this Court should sentence Torres to 3 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Dated:    New York, New York
          February 26, 2025

                              Respectfully submitted,

                              MATTHEW PODOLSKY
                              Acting United States Attorney


          By:    _____
                              Benjamin A. Gianforti
                              Assistant United States Attorney
                              (212) 637-2490

15