# EXHIBIT 1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          24 CR 447 (RA)

5   CHARLIE HERNANDEZ,

6                Defendant.              Sentence
    ------------------------------x
7
                                         New York, N.Y.
8                                        December 20, 2024
                                         11:00 a.m.
9

10  Before:

11
                        HON. RONNIE ABRAMS,
12
                                         District Judge
13
                            APPEARANCES
14
    EDWARD Y. KIM
15       Acting United States Attorney for the
         Southern District of New York
16  BY:  BENJAMIN A. GIANFORTI
         Assistant United States Attorney
17
    CHRISTOPHER D. WRIGHT
18       Attorney for Defendant

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (Case called)

2              MR. GIANFORTI:  Good morning, your Honor, Ben

3  Gianforti for the government.

4              THE COURT:  Good morning.

5              MR. WRIGHT:  Good morning as well, your Honor,

6  Christopher Wright for Charlie Hernandez, who is present today

7  in court seated to my immediate right.

8              THE COURT:  Good morning to you as well.

9              This matter is on for sentencing.  Mr. Hernandez pled

10  guilty in July to operating an unlicensed money transmitting

11  business.

12              In connection with today's proceeding I have reviewed

13  the following submissions:  The presentence investigation

14  report, dated October 30; Mr. Hernandez's sentencing

15  memorandum, dated December 10, with accompanying exhibits; and

16  the government's sentencing memorandum, dated December 13.

17              Have the parties received each of these submissions?

18              MR. GIANFORTI:  Yes.

19              MR. WRIGHT:  Yes, we have.

20              THE COURT:  I want to note, I thought the submissions

21  on both sides were really excellent, so I want to thank you for

22  that.

23              Why don't we begin by discussing the presentence

24  report, which is prepared by the probation department.

25              Mr. Wright, have you read the presentence report and

1    discussed it with your client?

2              MR. WRIGHT:  Yes, we have.

3              THE COURT:  Do you have any objections?

4              MR. WRIGHT:  No objections.

5              THE COURT:  Mr. Hernandez, did you have a chance to

6    read the presentence report?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Did you discuss it with your attorney?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Does the government have any objections to

11   the presentence report?

12             MR. GIANFORTI:  No, your Honor.

13             THE COURT:  The Court adopts the factual findings in

14   the report.  The presentence report will be made part of the

15   record in this matter and placed under seal.  If an appeal is

16   taken, counsel on appeal may have access to the sealed report

17   without further application to the Court.

18             Mr. Hernandez, when you pled guilty back in July, we

19   discussed the federal sentencing guidelines.

20             Do you remember that?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  The guidelines, as you know, are a set of

23   rules that are published by the United States Sentencing

24   Commission, and they are designed to guide judges when they

25   impose sentence.  Although at one time they were mandatory,

1    meaning judges were required to follow the guidelines, they are

2    no longer binding, but judges must nonetheless properly ensure

3    that they are calculating the guidelines properly and consider

4    them in imposing sentence.

5         Do the parties agree with the guidelines calculation

6    in the presentence report, pursuant to which Mr. Hernandez's

7    offense level is 17, his criminal history category is I, and

8    his recommended guidelines sentence is 24 to 30 months?

9         MR. GIANFORTI:  Yes.

10        MR. WRIGHT:  Yes.  The defense agrees.

11        THE COURT:  I agree as well.  I did my own independent

12   calculation of the guidelines, and I agree with the calculation

13   in the presentence report.

14        As I said a moment ago, that range is only advisory.

15   Courts can impose a sentence outside of that range based on one

16   of two legal concepts, a departure or a variance.  A departure

17   allows for a sentence outside of the advisory range based on

18   some provision in the guidelines themselves.  In the plea

19   agreement both parties, however, agree that no departure from

20   the guidelines range is warranted, and I just want to confirm

21   that that's correct.

22        MR. GIANFORTI:  Yes, your Honor.

23        MR. WRIGHT:  Yes.  That's correct.

24        THE COURT:  Nevertheless, I have considered whether

25   there is an appropriate basis for departure from the advisory

1    range.  And while recognizing that I have the authority to

2    depart, I don't find any grounds warranting a departure under

3    the guidelines.

4         But I do, of course, also have the ability to impose a

5    nonguidelines sentence based on what we call a variance

6    pursuant to the factors set forth in 18 United States Code

7    Section 3553(a).  And I know that that is what Mr. Hernandez is

8    seeking, and the government is not objecting, although it's

9    advocating for a three-month, is my understanding.

10        I just want to confirm before we proceed that none of

11   the codefendants have been sentenced yet, is that correct?

12        MR. GIANFORTI:  That's right.  Mr. Hernandez is the

13   first of the five flight attendants that were charged.

14        THE COURT:  Thank you.

15        Would the government like to be heard?

16        MR. GIANFORTI:  Yes, your Honor.  May I address the

17   Court from the podium?

18        THE COURT:  Yes.  Just please speak into the

19   microphone.

20        MR. GIANFORTI:  Your Honor, as you rightly noted, the

21   government is seeking a sentence of approximately three months

22   in this case.

23        Your Honor, this is a difficult case, and I think

24   that's reflected in the government's sentencing submission, the

25   defendant's sentencing submission because, on the one hand, the

conduct here is very serious, and I want to talk a little bit

more about that.  But on the other hand, Mr. Hernandez has a

lot going on, I think a lot of things that are mitigating in a

case like this, so that's why the government arrived at its

recommendation, which I think reflects on our part a delicate

balancing of all these things.

Let me walk through what our thinking was around our

recommendation.

Your Honor, while the guidelines here reflect a

relatively modest dollar amount that's at issue, we essentially

held Mr. Hernandez responsible for that one money drop that we

were following and were aware of, the $120,000 one that's

mentioned in the underlying complaint.

But, of course, the presentence report, which is

unobjected to, says that Mr. Hernandez, over the course of the

five or so years that he was doing this for our cooperator,

moved something like 2 or $3 million in drug money over the

course of that, so he is doing this repeatedly over and over

again.

If you do the math on it, the one money drop that's

the focus of the complaint, it looked like he was going to try

to do about $60,000, and that is what his then codefendant,

Sara Pujols, got caught with, about $60,000.

If you think about how much cash you can kind of

realistically bring with you on any given run in your luggage,

1  in your bag, whatever, he is not going to be able to bring a

2  million dollars at a time.  You can't pack that much cash into

3  a carry-on bag, let's say.

4         Let's assume that he is doing runs on the order of

5  magnitude of about $60,000, maybe a little bit more than that.

6  If you sort of divide that into the 2 or $3 million that we

7  estimate that he did over those five years, that's a lot of

8  runs.  He is doing this repeatedly.

9         I think it's also important to keep in mind the

10  broader context of the government's case as a whole, really the

11  case against our cooperator's money-laundering organization as

12  a whole.  And just the piece that we took down, these five

13  flight attendants, if you aggregate the estimated amounts of

14  money that they were moving, it ends up being 10, 15, $20

15  million.  That's just what we are aware of.

16         Just to give you a sense, our cooperator was an

17  incredibly successful mover of drug money from this area to the

18  Dominican Republic for many, many years, and we caught just a

19  piece of it.

20         I think it's also important to remember that these are

21  not marijuana dealers that he is moving money for.  They are

22  moving opioids in bulk, some of them laced with fentanyl.  I

23  know this because our cooperator actually sold some of those

24  pills to us before we charged him.

25         And these aren't just sort of run-of-the-mill

1  businessmen in the drug trade.  These are dangerous drug

2  dealers.  On multiple times during the course of this

3  investigation our cooperator has been personally threatened by

4  the drug dealers that he has had as clients for not being able

5  to move money when they want him to, money maybe going missing,

6  things like that.  These are people who are prepared to kill,

7  frankly, if their business is disrupted.

8          Mr. Hernandez was a conduit for these people.  He

9  allowed their money to get from here, where they don't want it,

10 because they can't spend it, down to the Dominican Republic so

11 they can live high in the hog down there.  Your Honor, you have

12 seen enough drug cases to know that this is a lucrative trade

13 and opioids -- this country is awash in opioids, and Mr.

14 Hernandez reflects a very small slice of it, but nonetheless an

15 important part of it.

16         Your Honor, I would also like to just underline again

17 that Mr. Hernandez really abused the position of trust here

18 with his known crew-member status.  In fact, you wouldn't have

19 been aware of this, your Honor, but before the PSR was

20 finalized, there was some discussion between myself and the

21 probation office about whether the abuse-of-trust enhancement

22 under 31.3 was applicable here.

23         THE COURT:  I actually was going to ask about that.

24         MR. GIANFORTI:  I went back and forth with at least

25 one or two of the lawyers that represent these flight

1    attendants, and they convinced me that it's not applicable

2    here.  If you look at the notes below that guideline, it

3    basically contemplates somebody who has got like a fiduciary

4    relationship with a client -- a lawyer with their client or an

5    investment manager with their client where they are abusing

6    that position of discretion, trust, etc., and it explicitly

7    says below that that this enhancement does not apply to say a

8    bank teller who just has access to money by virtue of being a

9    bank teller.

10              Given all of those facts and given what happened here,

11   we agreed, the government agreed, that that enhancement was not

12   applicable here.

13              THE COURT:  But I will say -- and I am glad you raised

14   this, because it feels like a breach of trust.

15              MR. GIANFORTI:  I agree.

16              THE COURT:  Given the way in which our airports and

17   our airlines are tied with national security, it feels like

18   that, and it's a fair issue to raise, even if it doesn't affect

19   the guidelines.

20              MR. GIANFORTI:  I think it's one of these things where

21   it's a little bit like what I said a moment ago about the

22   amount of money that we think that he moved over the course of

23   those five years.  It's not reflected in the guidelines, but

24   that doesn't mean that your Honor has to close your eyes to it.

25   It is the same thing here.  I think you're quite right, there

1   was an abuse of trust.  Airports are the front lines in this

2   country.  They keep bad stuff out, to the extent they can, and

3   they keep bad stuff in, to the extent they can, so, in this

4   case, drug money.

5        Mr. Hernandez had this status.  He knew that it meant

6   he wasn't going to get a close look at the airport, and he

7   abused it.  As I say, he abused it repeatedly.

8        Your Honor, I think I also would just like to

9   highlight again that there really is a need for general

10  deterrence in this case.  I'll tell you that in the course of

11  this investigation I spoke to JetBlue.  I spoke to some of the

12  other airlines that are involved in this investigation.

13       Frankly, I was shocked that this kind of conduct, the

14  smuggling of bulk cash, was really not a risk that they were

15  alive to.  There weren't trainings.  There weren't compliance

16  controls.  There really wasn't anything that these airlines

17  were doing other than just saying, don't break the law, but

18  like nothing specific about this particular risk.  Particularly

19  along routes like New York to the Dominican Republic, where

20  huge drug market here, huge amount of drug dealing coming out

21  of the Dominican Republic, nothing is in place.

22       I think even a short term of imprisonment here will

23  send a general message to the airline industry that this is

24  incredibly serious.  They need to take it seriously.  Every

25  flight attendant in the airline business in the United States

 1    needs to take this seriously.

 2            Your Honor, again, while the government is very

 3    sympathetic to the defendant's personal circumstances, I think

 4    a term of imprisonment is still necessary here because of that

 5    general deterrence factor, and I have every confidence that the

 6    Bureau of Prisons, for whatever stay your Honor imposes, if

 7    any, will be able to take care of Mr. Hernandez during that

 8    period.

 9            Your Honor, just another note that I think I didn't

10    include in our sentencing submission is that I've really come

11    to view this case not as a case about greed, necessarily.

12    Really, it seemed like the people that were involved in this

13    money movement were kind of just doing it for a little extra

14    cash on the side.

15            Mr. Hernandez, by the end of his time at JetBlue, was

16    actually making a pretty sizeable salary, as you know.  But

17    some of these folks that are less senior are really not making

18    a lot of money.  I think that they are unionized, and they are

19    really not making a ton of money.

20            I think it's important for your Honor to know, from

21    our perspective, this isn't like a typical fraud, where they

22    are taking money from victims and going and buying luxury

23    goods, something like that.  I have got no evidence of that.  I

24    think this was really about having a little bit of extra

25    spending money, frankly.  That doesn't excuse it, but I think

 1    it's important context for your Honor.

 2            Unless you have any other questions for me, your

 3    Honor, that's all the government has to say.

 4            THE COURT:  No.  Thank you.

 5            I do think it's worth recognizing that the government

 6    has taken a pretty unusual position in this case and made what

 7    appears to be a very reasonable recommendation.  I understand

 8    Mr. Hernandez disagrees, and I'll hear you out, but I also

 9    think that the office should be commended for when it does kind

10    of make a recommendation significantly below the guidelines,

11    because it's really looking at Mr. Hernandez.  Sometimes, you

12    know, good people do bad things, and there is sort of a

13    recognition of mitigating factors, but also all of the factors

14    that were just noted by AUSA Gianforti.

15            In any event, why don't I hear from you, Mr. Wright.

16            MR. WRIGHT:  Thank you, your Honor.

17            Judge, may I use the podium?

18            THE COURT:  Yes, please.

19            MR. WRIGHT:  Your Honor, I think you just said it

20    best, that sometimes good people do bad things.  Lord knows, I

21    have represented all manner of criminal clients in my career.

22    Charlie falls into that category, Charlie Hernandez, that is,

23    my client, falls into that category of men who I have

24    represented who are really a good person.

25            Since his arrest in May, I have had many meetings with

1   Charlie.  I have gotten to know him and his family, many of

2   whom are present today in court.

3         Just for the record, his mom; his dad; two aunts;

4   cousins; his niece and nephew, who are very much more like a

5   son and daughter rather than simply a niece and nephew to him,

6   and he is very much their father figure; as well as his fiancé,

7   are all present in court.

8         THE COURT:  Thank you all for being here today.

9         MR. WRIGHT:  I can see Charlie made an awful choice.

10  He had a great career that he really loved, as he described to

11  me.  It was quite glamorous.  He flew around the world, has

12  been everywhere, has seen all manner of wonderful cities and

13  been to great places.

14        And he really is a great success story in so many

15  ways, a great immigrant success story.  He came to the United

16  States from the Dominican Republic when he was 11 years old.

17  His parents worked hard.  His mother and father are here.  His

18  father labored at a bodega in Queens.  And they are deeply

19  disappointed, deeply disappointed as to the decisions Charlie

20  made, as is his family.

21        The sense I get is, Charlie was living this, as I said

22  in my memo, this very secret life engaged in this behavior.

23  And I have spoken to Charlie about it, and he has been quite

24  frank with me, and I think he was frank in the letter that he

25  wrote to your Honor and in the statements that he will make

1    today, that he wasn't thinking about consequences.  He was not.

2    He was not envisioning him being here today facing the

3    terrifying prospect of going to a federal jail.

4          And as the government said, the benefit that Charlie

5    got from this, if you will, was rather meager.  It was not a

6    great payoff for Charlie.  The risk and the reward just did not

7    match up in any meaningful way.

8          Since he was arrested, these about eight or nine

9    months, he has done everything that one would hope if someone

10   has been arrested and facing federal prosecution.  He has taken

11   this nothing but extraordinarily seriously.  He has entered

12   mental health treatment to treat his depression and bipolar

13   factors that may have contributed to the poor decision making

14   he has made in the past but, needless to say, are not an

15   excuse, but I think simply helps explain to him and to his

16   family and fiancé, in particular, to sort of understand and

17   grapple with why Charlie would risk so much.

18         As the government said, he had a good job, and he

19   really enjoyed it.  He loved that job.  And as the letters I

20   submitted on behalf of his colleagues, they loved him as well.

21   He was really a well-regarded employee at JetBlue.

22         Charlie is anguished about today, as maybe you can

23   see.  But I will tell you, despite his appearance today, he is

24   doing much better, much better, I can say, than when he was

25   first arrested.

1        He expressed to me suicidal ideation.  He told that

2   when he was first arrested.  There was concern because he had

3   expressed that to the arresting officers, and that was a

4   recommendation of pretrial, that he seek treatment and, again,

5   something that he has faithfully and consistently done.

6        As I talked about in my memo, Judge, facing the

7   prospect of jail is forboding for anybody, but especially for

8   an openly gay man entering, whether it's the Federal Bureau of

9   Prisons or any jail.  Unfortunately, it's perilous to be a gay

10   man in an American jail today, tragically and unfortunately.

11        I discussed that in my memo, but, needless to say,

12   Judge, that's not a get-out-of-jail-free card, and Charlie

13   understands that, but it is the sad and grim reality of our

14   jails.

15        There are other concerns as well for him, that he

16   would like to continue in the mental health treatment that he

17   has dutifully been partaking.  Jail, of course, would disrupt

18   that, as well as his other concerns about his physical

19   conditions that I talked about in my memo.  He is concerned and

20   wants to make sure he can attend to those, as he faithfully has

21   done in taking care of himself.

22        Judge, our request, and I acknowledge it was a

23   significant variance from what the guidelines recommend and

24   what probation recommended, and I as well, Judge, appreciate

25   deeply the recommendation from the government, as does my

 1    client.

 2            Our request, again, just was a term of home

 3    confinement, community service, a term of postrelease

 4    supervision that the Court feels is just and appropriate, and I

 5    think that would speak to all of the 3553(a) factors.

 6            And, admittedly, I think the one difficulty we have,

 7    if you will, of all of the 3553(a) factors, which I suppose

 8    exists in every case, but it is particular to this case, is the

 9    issue of general deterrence.

10            And the government brings up a good point.  How do we

11    deter airline stewards or airline employees at any level

12    engaging in this behavior?  I don't know.  I don't think the

13    world would see -- airline stewards, for instance, would look

14    out and see, oh, Charlie Hernandez got away with this.  He got

15    a slap on the wrist.  He didn't have to go to jail.

16            My sense, from speaking to Charlie and speaking to his

17    family, is that the other airline stewards have been

18    traumatized by what happened to Charlie, that it is well known

19    within the industry what happened to Charlie, and that this

20    ordeal has been awful for him, of course, because of his own

21    decision making, no one else's but his.

22            THE COURT:  I often question how much general

23    deterrence works, in certain cases at least.  I think in some

24    cases it does.  I think more so in the white collar area.

25            But within this community of flight attendants, I do

1    think the difference between getting a jail sentence, even if

2    it's a short one, and not really does serve a deterrent value

3    within that community who are following a case like this.  Like

4    maybe the people at large won't hear about it, but people

5    within that community who work for airlines I think will, and

6    it really may lead people to say this is not worth the risk,

7    right.

8          MR. WRIGHT:  I am sure that once this case is

9    resolved, the rest of the world will pay no notice to this, but

10   I don't doubt that airline stewards will definitely take note

11   of the outcome of this case, and that will possibly be part of

12   their calculus to whether or not they were to engage in similar

13   behavior, thinking, well, I may go to jail if I do this.

14   That's very well possible and likely true if airline stewards

15   were to think that.  I think that's likely true.

16          I do think, though, again -- and I can feel it,

17   especially with Mr. Hernandez, the pain and the trauma of what

18   has happened to him, the public humiliation, have all been very

19   profound, and obviously for him in terms of specific

20   deterrence, but I completely understand the Court's point about

21   general deterrence.  I do think it does have a related effect.

22   I think that the very act of walking into this building, for

23   instance, was troubling and difficult for Charlie.

24          THE COURT:  I'm sure.

25          To be clear, I don't think, and I don't hear the

1    government to say that there is a concern about recidivism with

2    respect to Mr. Hernandez.  I think specific deterrence is not a

3    concern here.

4            I can look at him right now.  I can see how scared he

5    looks, honestly how emotional this is.  I don't doubt that for

6    a minute.  And, as I said earlier, I don't doubt that he is the

7    good person that all of the friends and family who wrote in

8    about him are.

9            I think, from my perspective, general deterrence and

10   recognizing the seriousness of the crime are the most important

11   or relevant sentencing factors here today.

12           MR. WRIGHT:  I agree completely, your Honor.

13           If I didn't say, I want to emphasize that Charlie does

14   understand how serious this crime was.  He really does.  And

15   when his coconspirator was detained back in 2019 and $60,000

16   was found on her, he promptly and immediately stopped engaging

17   in this behavior.  It hit him hard then.  And, of course, once

18   he got arrested, he realized that this is a really serious

19   offense and is sort of the back end, if you will, of the

20   narcotics trade in this country, as the government discussed,

21   that Charlie recognizes that he has, unfortunately and

22   tragically, played a role in that trade.

23           Again, not something that his parents envisioned when

24   they brought him here as a young boy and not something that

25   Charlie envisioned as he started his otherwise successful

1    career at JetBlue.

2           Judge, it's tragic we are here.  I suppose it's part

3    of the trade in what I've chosen to pursue.  But it is tragic.

4    I know for Charlie and his family it has been really, really

5    difficult.

6           Again, Judge, for all the reasons I said in my memo

7    and otherwise, I would ask for any nonincarceratory sentence

8    that the Court feels is just and appropriate.

9           THE COURT:  Thank you.

10           MR. WRIGHT:  Thank you.

11           THE COURT:  Mr. Hernandez, I read your letter, but I'm

12    happy to hear anything you would like to say today.

13           Just bring the microphone close, sir, so I can hear

14    you, sir.

15           THE DEFENDANT:  Your Honor, I come to you deeply,

16    deeply sorry.  I'm sorry to my family.  I know now, through

17    therapy, my bipolar disorder hindered me to know the risk and

18    the factors of what I was doing.  It's not an excuse.  I beg

19    you to have mercy on me.  I'm sorry.

20           I know that by me seeking treatment still, I need to

21    do it to get better.  I can come back to society and be a

22    productive person that I know I can be.

23           All I can say is, I'm sorry for what I did because I

24    didn't have no concern because I didn't know what was right or

25    wrong.  But I do now, through my treatment, through everything

1    that I have gone through in this past months, and I hope that

2    you have mercy on me.

3              That's all I can ask from you, your Honor.

4              THE COURT:  Thank you, Mr. Hernandez.

5              Take a minute.

6              You're done, sir?

7              THE DEFENDANT:  I just want you to allow me to be the

8    son, the brother, and the father figure that I can be to my

9    niece and nephew.  Please allow me to do that, your Honor.

10             THE COURT:  Thank you, Mr. Hernandez.

11             I am required to consider the advisory range of 24 to

12   30 months, as well as various other factors that are outlined

13   in a provision of the law -- it is 18 United States Code

14   Section 3553(a) -- and I have done so.

15             Those factors include, but are not limited to, the

16   nature and circumstances of the offense and the personal

17   history and characteristics of the defendant, because each

18   defendant must be considered individually as a person.

19             Judges are also required to consider the need for the

20   sentence imposed to reflect the seriousness of the offense,

21   promote respect for the law, provide just punishment for the

22   offense, afford adequate deterrence to criminal conduct,

23   protect the public from future crimes of the defendant, and

24   avoid unwarranted sentencing disparities, among other things.

25             I think if you ask most judges what the hardest thing

1    they do is, it's sentencing.  But some sentencings are

2    admittedly harder than others, and this one, as was noted

3    earlier, is especially difficult because, as I said, I don't

4    have any reason to doubt that Mr. Hernandez is a good person,

5    who has done a lot of good things in his life, but he also

6    engaged in this very serious conduct for a lengthy period of

7    time, and I have got to balance all those factors that I just

8    mentioned, which is an especially hard thing to do today.

9         Mr. Hernandez was among a network of flight attendants

10    that abused their positions to illegally transport drug

11    proceeds from New York City to the Dominican Republic on behalf

12    of an international money laundering operation.  As known crew

13    members, they were able to slip through TSA security

14    undetected, and he knew that he was smuggling drug money, and

15    he did it repeatedly for five years.  If this had been a week

16    or two weeks or a month, just a short lapse in judgment, I

17    would look at this case differently.  But this was five years,

18    with the government estimating that he laundered approximately

19    two and a half million dollars, even if he only received a

20    small portion in return.  And he only stopped because he saw

21    someone else get arrested.

22         Mr. Hernandez, although you didn't sell the drugs

23    yourself, and I know that, you aided and abetted these drug

24    conspiracies to help transport the proceeds internationally.

25    Drugs like fentanyl cause real harm to real people.  I've had a

1   number of cases since I've been a judge where people have died

2   of fentanyl overdoses.  I have seen those parents.

3       I see your parents, your family here today, and how

4   traumatized they are, but I have also seen cases where parents

5   of young people have died with fentanyl doses.  Like, this

6   causes real harm to real people, and these organizations can't

7   function without getting their proceeds, right, and you helped

8   in that process.  And, as I said, you didn't do it for a week

9   or two weeks or even a year.  You did it for five years.

10       With that said, Mr. Hernandez immediately accepted

11   responsibility.  He waived indictment.  He pled guilty.  He is

12   now 42.  He is engaged.  He has a history, obviously, of

13   gainful employment.  He has no other criminal history.  He has

14   no history of violence.  So those are all things that I'm

15   considering today.

16       Most critically, I think, in terms of mitigating

17   factors, Mr. Hernandez has some real physical and mental health

18   issues that present a significant and, as the government noted,

19   unique mitigating factor here.

20       I want to make sure that he is safe and that he can

21   get whatever medical treatment that he needs.

22       There is no doubt that Mr. Hernandez is genuinely

23   remorseful.  He has been compliant with terms of his pretrial

24   release.  But, ultimately, I have to balance the mitigating

25   factors with the need to deter others from engaging in conduct

1  like this, and I really do think deterrence within this

2  community of flight attendants and others who work in that

3  industry is real, so I have done the best I can to balance

4  those factors, and I am ready to impose sentence.

5          Mr. Hernandez, could you please rise.

6          It's the judgment of this Court that you be committed

7  to the custody of the Bureau of Prisons for a term of three

8  months to be followed by a term of supervised release of three

9  years, nine months of which will be placed on home detention.

10          I believe that this sentence is sufficient but not

11  greater than necessary to comply with the purposes of

12  sentencing set forth in the law.

13          You can be seated, sir.

14          I do want to be clear about one thing.  I confirmed

15  before the sentence today that he will not be designated to the

16  Metropolitan Detention Center.  And if he is designated there,

17  I want you to reach out to me right away.  I am going to make

18  any recommendations that you request, Mr. Wright, with respect

19  to designation, and I'm happy, actually, to make a phone call,

20  as well, to the Bureau of Prisons and follow up more directly

21  than I normally would to ensure that he is placed somewhere

22  where he can be safe and get the medical care that he needs.

23          Now I am going to read the conditions of your

24  supervised release.  You will be on supervised release for

25  three years.  As I said, nine months will be on home detention.

1    You will be allowed to work on home detention.  You will be

2    allowed to go to doctors, religious services, but it's still

3    another form of punishment.

4           The mandatory and standard conditions of release are

5    on pages 25 through 27 of the presentence report.  Would you

6    like me to read those out loud, or do you waive their public

7    reading?

8           MR. WRIGHT:  Defense waives its public reading.

9           THE COURT:  I will just note that Mr. Hernandez

10   already noted that he read the presentence report, but I'm just

11   going to ask you to go over those again yourself.

12          Are there any objections to the standard conditions of

13   release?

14          MR. WRIGHT:  No objections, your Honor.

15          THE COURT:  Excuse me.  The special conditions is what

16   I meant to say.

17          MR. WRIGHT:  No.

18          THE COURT:  Consistent with what's recommended on page

19   27, you must submit to a search of your person, property,

20   residence, office, vehicle, papers, computers, as defined by 18

21   United States Code Section 1030(e)(1), cell phones or other

22   devices or media used for electronic communications, data

23   storage, cloud storage, or network storage.

24          The probation office may conduct a search under this

25   condition only when there is reasonable suspicion that you

 1    violated a condition of your supervision or committed a new

 2    crime and that the areas to be searched contain evidence of

 3    this violation or crime.  The search must be conducted by a

 4    United States Probation Officer, although other law enforcement

 5    officers may assist the probation officer.  The search must be

 6    conducted at a reasonable time and in a reasonable manner.

 7    Failure to submit on a search may be grounds for revocation of

 8    release.  You must warn any other occupants that the premises

 9    may be subject to search pursuant to this condition.  And I'm

10    imposing this condition because the offense involved receiving

11    and transporting proceeds in a secretive way and to protect the

12    public and deter others.

13          In addition, in light of the mental health issues that

14    have been raised and listed in the presentence report in

15    paragraphs 53 and 54, you must participate in an inpatient

16    mental health treatment program -- sorry.

17          You have no objection to the inpatient?  I hadn't

18    focused on inpatient versus outpatient.

19          MR. WRIGHT:  I had assumed it meant outpatient, your

20    Honor.

21          THE COURT:  I am going to leave that vague.  I am just

22    going to say:  He must participate in a mental health treatment

23    program approved by the probation office, but I am not

24    specifically going to say inpatient, because I don't know that

25    that's what will be necessary here.  And I want the probation

1    department to take a closer look at that.

2          MR. WRIGHT:  I know he was evaluated by pretrial, and

3    they felt the current outpatient program he has is appropriate.

4    By all appearances, it seems to be effective.

5          THE COURT:  Why don't I actually specify that it will

6    be outpatient mental health treatment program.  If the

7    probation department disagrees, they can come back to me, but I

8    would rather that be the presumption, that it's outpatient.

9          MR. WRIGHT:  Thank you.

10          THE COURT:  Approved by the probation office.

11          You must continue to take any prescribed medications

12    unless otherwise instructed by the healthcare provider.  You

13    must contribute to the cost of services rendered based on your

14    ability to pay and the availability of third-party payments.

15    The Court authorizes the release of available psychological and

16    psychiatric evaluations and reports, including the presentence

17    investigation report, to the healthcare provider.  And that's,

18    as I noted, for the reasons noted.

19          And you will be supervised in the district of your

20    residence.

21          I'm not going to impose a fine because I think it

22    would be difficult to pay one, particularly with the forfeiture

23    order.  I'm imposing the mandatory special assessment of $100.

24          The government is not seeking restitution, but I did

25    sign a consent preliminary order of forfeiture money judgment

1  in the amount of $121,215, $61,215 of which is joint and

2  several with defendant Sara Valerio Pujols.  And I will make

3  that order part of my judgment.

4          Before I read Mr. Hernandez his appellate rights, I'd

5  like to discuss a surrender date.  It is usually around 60

6  days, but I can be flexible.

7          MR. WRIGHT:  Sixty days is fine, your Honor.

8          THE COURT:  Ms. Cavale, what would you recommend?

9          Does Mr. Hernandez want to do this sooner rather than

10  later?  I assume he wants to be home for the holidays, but some

11  people want to just get this over with.

12          MR. WRIGHT:  Judge, defense is good with 60 days.

13          THE COURT:  February 17 is a holiday, so do you want

14  to say February 24?

15          MR. WRIGHT:  Yes.

16          THE COURT:  He shall surrender for service at the

17  institution designated by the Bureau of Prisons by 2 p.m. on

18  February 24.

19          Again, if you don't receive notice of the designated

20  facility or if he is designated to MDC, let me know

21  immediately.

22          MR. WRIGHT:  Yes, I will.  If he's designated to a

23  jail that's not the Metropolitan Detention Center, but I have

24  concerns about that particular jail, let's say it is Fort Dix

25  or wherever, can I write the Court?

```
 1            THE COURT:  You can.  The problem is, it's really up
 2   to the Bureau of Prisons.  I can make a recommendation.  I'd
 3   like to make the best recommendation I can make early on.  I
 4   don't know how the Bureau of Prisons will kind of assess this.
 5            Like, on one hand, the charge is operating an
 6   unlicensed money transmission business, so I think that's
 7   viewed as a nonviolent crime, and the likelihood -- I want him
 8   to get in a low-security prison, if at all possible.  I think
 9   that should be our goal, and, as I said, I can reach out.  It's
10   really up to the Bureau of Prisons.  So I worry if once the
11   designation is made, there isn't anything I will be able to do
12   about it.
13            MR. WRIGHT:  What I'll do is, I will talk to my client
14   and his family, and I'll write the Court promptly with what we
15   recommend.
16            THE COURT:  Should I wait to issue the judgment?
17            MR. WRIGHT:  Yes.  I think that's right.  If that's
18   OK.
19            THE COURT:  Yeah.  I just want to do that as soon as
20   possible.
21            Can you get it to us by Monday?
22            MR. WRIGHT:  Absolutely, yes.  Perfect.
23            THE COURT:  Thank you.
24            Is there any legal reason this sentence cannot be
25   imposed?
```

1          MR. GIANFORTI:  No, your Honor.

2          MR. WRIGHT:  No, your Honor.

3          THE COURT:  That's the sentence of this Court.

4          You have a right to appeal your conviction and

5     sentence, except to whatever extent you may have validly waived

6     that right as part of your plea agreement.  If you do choose to

7     appeal, the notice of appeal must be filed within 14 days of

8     the judgment of conviction.  If you are not able to pay for the

9     cost of an appeal, you may apply for leave to appeal *in forma*

10    *pauperis*, which simply means that court costs, such as filing

11    fees, will be waived.  If you request, the Clerk of Court will

12    prepare and file a notice of appeal on your behalf.

13         As I said earlier, and I say this a lot at sentencing,

14    just because I believe it to be true, I don't think people need

15    to be defined by the worst mistakes they ever made.

16         Mr. Hernandez you obviously have so much love and

17    support, and I read all those letters.  And people described

18    you as charismatic and family oriented and funny and reliable

19    and nurturing and selfless and a remarkable person, and that's

20    all still true.  How you are defined in life is just going to

21    be about how you live your life going forward.

22         But I just felt like this is a sentence I needed to

23    impose, for the reasons that I stated, to deter others from

24    engaging in this serious and harmful conduct, but that doesn't

25    take anything away from sort of who you are and the goodness of

1  who you are.  So I would just do as best you can to lean into

2  all the support you have behind you and around you, and I wish

3  you luck going forward.

4          Are there any other applications at this time?

5          MR. GIANFORTI:  No, your Honor.  There are no

6  underlying charges, so there is no motion to dismiss.

7          THE COURT:  Mr. Wright, anything else from you?

8          MR. WRIGHT:  Nothing, your Honor.

9          THE COURT:  Thank you.  We are adjourned.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25