# EXHIBIT 2

P2L8FABS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        24 Cr. 481 (AS)

5  JAROL FABIO,

6              Defendant.               Sentence

7  ------------------------------x

8                                       February 21, 2025
                                        10:20 a.m.
9

10 Before:
                    HON. ARUN SUBRAMANIAN,
11
                                        District Judge
12
                        APPEARANCES
13
   MATTHEW D. PODOLSKY
14      Acting United States Attorney for the
        Southern District of New York
15 BENJAMIN A. GIANFORTI
        Assistant United States Attorney
16
   LISA SCOLARI
17      Attorney for Defendant

18
   Also present:  ASHLEY GEISER, Probation
19

20

21

22

23

24

25

P2L8FABS

```
 1                    (In open court; case called)
 2              THE DEPUTY CLERK:  Can the parties, starting with
 3       counsel for the government, please state their appearances for
 4       the record.
 5              MR. GIANFORTI:  Good morning, your Honor.  Ben
 6       Gianforti for the government, joined by Probation Officer
 7       Ashley Geiser.
 8              THE COURT:  Good morning.
 9              MS. SCOLARI:  Good morning, your Honor.  Lisa Scolari
10       for Mr. Fabio, who is here in court.
11              I would like, if the Court permits me, to point out
12       that he has got numerous people in the audience that are all
13       here to support him, most of whom have written letters.  They
14       include his family and friends.
15              THE COURT:  All right.  And I want to thank everybody
16       for being here.  Mr. Fabio, it's good to see you here.  And I
17       appreciate all of the letters, and I appreciate your appearance
18       here today.  Thank you very much for that.
19              So, what we are going to do, Mr. Fabio, is, first
20       there are some technical things that I have to go through.  Ms.
21       Scolari has probably told you about this.  I am going to run
22       through those issues, and then I am going to give everyone a
23       chance to address what the appropriate sentence here would be.
24              First, I am going to go over the materials that I have
25       received to make sure I haven't missed anything.
```

P2L8FABS

1          I have a presentence report that was prepared on

2    October 11, 2024, and revised on November 8.

3          I have the government's sentencing submission, dated

4    February 14.

5          And, Ms. Scolari, your sentencing submission, dated

6    February 7, 2025, with attached letters of support and letters

7    from licensed mental health professionals.

8          I have two supplemental submissions from Ms. Scolari,

9    attaching additional letters of support.

10         Is there anything that I have missed?

11         Mr. Gianforti.

12         MR. GIANFORTI:  No.

13         THE COURT:  Ms. Scolari.

14         MS. SCOLARI:  No, your Honor.  Thank you.

15         THE COURT:  Ms. Scolari, have you read the PSR and

16   discussed it with your client?

17         MS. SCOLARI:  I have, your Honor.  And we have no

18   objections.

19         THE COURT:  Mr. Fabio, have you read and discussed

20   with Ms. Scolari the PSR prepared on October 11 and revised on

21   November 8?

22         THE DEFENDANT:  Yes, I have.

23         THE COURT:  Thank you.

24         Now, Ms. Scolari, you said that there were no

25   objections, but I did note in your sentencing submission that

P2L8FABS

| 1 | you had raised some question about the time period that was in |
| 2 | the PSR as well as the amount of money that was smuggled here.

           MS. SCOLARI:  I should have said no further

objections.  You're right, your Honor.

           THE COURT:  Is that an objection that the Court needs

to resolve in terms of the PSR?

           MS. SCOLARI:  I don't think so.  I think it's an issue

that the Court can consider at sentencing, but I don't think it

has to be addressed in the PSR.

           THE COURT:  Why don't you articulate what the

objection is because it's stated in passing?

           As I understand it, your objection is that while it

may be true that, in terms of the start date and end date, it's

six years, there were periods of time within that six years

where Mr. Fabio simply wasn't in his position, and so he wasn't

at that point in time involved in any unlicensed money

transmission business.  Is that fair?

           MS. SCOLARI:  Yes, your Honor.  The point is this.

When the government says he was doing it for six years, there

are no records, there is no evidence of what was being done,

how much was being taken.  So it creates the impression that he

was doing it consistently.  They allege $1.5 million.  That's a

lot of money and a lot of trips.  But there is no record of it.

I think it's an estimate.  And I think it's just important for

the Court to be aware that it wasn't constant, it was

P2L8FABS

```
1    intermittent.  And we raised these periods when he couldn't
2    have been doing it, and he wasn't doing it, just to show the
3    Court that it wasn't constant.  It doesn't mean what he did was
4    right, acceptable, excusable.  He is not backing away from his
5    acceptance of responsibility at all.  It's just a point that I
6    wanted to make.
7                THE COURT:  All right.  Let me put it this way.  I
8    understand the points that you are making, and we will address
9    those when we go over the 3553(a) factors.  But for purposes of
10   the PSR, I take it that you're not objecting to the facts as
11   alleged in the PSR, meaning the government has a basis for the
12   amounts specified, those are in the PSR.  So you're not raising
13   a formal objection to those findings as set out in the PSR.
14               MS. SCOLARI:  That is correct, your Honor.  It's more
15   of a 3553(a) issue.  The government made those allegations to
16   probation I would guess based on their informant.  And since
17   nothing was provided in discovery, I think it's fair for me to
18   assume that there were no records, that it's an estimate by an
19   informant that was dealing with multiple people.  So it really,
20   frankly, is a 3553(a) issue, not an objection to the PSR.
21               THE COURT:  Mr. Gianforti, do you want to address
22   these two issues?
23               So, there is the time period, which, I take it, you're
24   saying, maybe that's true, he was out on medical leave and that
25   may be right, but more importantly, as to the $1.5 million.
```

P2L8FABS

1            MR. GIANFORTI:  So, as to the $1.5 million, your

2    Honor, that's at paragraph 28 of the PSR.  And the information

3    that the government provided to probation, and what is

4    reflected here is that, yes, indeed, that is an estimate

5    provided by our cooperator.  So I think you're at liberty, your

6    Honor, to sort of take that into account, take it with a grain

7    of salt, whatever you want to do.  Ms. Scolari is right, I

8    don't have records that say Mr. Fabio did this many runs for

9    this amount of money.  These are all sort of, looking back, the

10   cooperator thinking it was about this much money.  So I don't

11   really think there is an objection to the PSR.  It sounds like

12   we are all sort of in agreement about what the PSR actually

13   says.

14            Just for the record, your Honor, the government didn't

15   provide discovery, in agreement with the defense.  This was all

16   done to move this case along quickly.  So I don't want your

17   Honor to get the impression that the government was withholding

18   discovery or something like that.

19            THE COURT:  We will take that up when we address the

20   3553(a) factors.  For present purposes, the Court will adopt

21   the presentence report and the factual findings therein.  It

22   will be made part of the record in this matter and placed under

23   seal.  If an appeal is taken, counsel on appeal may have access

24   to the sealed report without further application to this Court.

25            Now, Mr. Fabio, I have to go through the guidelines,

P2L8FABS

1    which I am sure you heard about from Ms. Scolari.  And some of

2    this is going to sound a little bit technical, but it's

3    important because it's one of the factors that Congress has

4    indicated I am required to consider.

5         So, Mr. Fabio pleaded guilty to operating an

6    unlicensed money transmission business, in violation of 18

7    U.S.C., Section 1960.

8         The presentence report reflects an offense level of 15

9    and a criminal history category of I.

10        Mr. Gianforti, the question I have for you is, just

11   walk me through why 2S1.1 applies here as opposed to 2S1.3.

12        Now, I understand that, in the guidelines, it

13   indicates that the former provision applies if the nature of

14   the unlicensed business was under 1960, I believe (b)(1)(C), as

15   opposed to (b)(1)(A) or (b)(1)(B).

16        The issue here is that when we were doing the plea

17   proceeding, I don't believe that there was any specification as

18   to what category the pleaded offense was under.  I think it was

19   just, generally speaking, there was an allocution as to the

20   operation of an unlicensed money transmission business.  For

21   the guidelines calculation, I do think it makes a difference

22   which guideline you proceed under.

23        And the other curious fact is that under either 2S1.1

24   or 2S1.3, there is an enhancement based on knowledge or belief

25   that the amount smuggled was part of another unlawful activity.

P2L8FABS

 1   In 2S1.1, it's a little bit more specific as to the nature of

 2   the unlawful activity, understandably, because subsection (C),

 3   that's part of the definition of the offense.  But 2S1.3 also

 4   has an enhancement for that.  I think it ultimately would cash

 5   out as a difference in six levels, if I am not mistaken.  So it

 6   would bring this down from an offense level of 15 to an offense

 7   level of 9.

 8          So with that backdrop, I am sure there is an

 9   explanation for this, but I wanted to understand the

10   government's perspective.  And I fully understand that because

11   the guidelines are advisory, this does not necessarily have an

12   impact in this case, but I am required to calculate the

13   guidelines properly.

14          MR. GIANFORTI:  Your Honor, can I just have a moment

15   to just look over the guidelines?

16          THE COURT:  Yes.  Of course.

17          (Pause)

18          MS. SCOLARI:  Your Honor, may I step up and speak with

19   the government for a moment?

20          THE COURT:  You may.

21          (Counsel confer)

22          MR. GIANFORTI:  I think we have resolved this.

23   Apologies for the delay.

24          So, the defendant, or at least the plea agreement is

25   drafted in terms of a violation of subsection (b)(1)(C) which

P2L8FABS

1  is, as you say, the movement of crime proceeds as opposed to a

2  failure to register under state or federal law.

3          THE COURT:  Yes.

4          MR. GIANFORTI:  So that's why the plea agreement, at

5  least, goes with 2S1.1 as opposed to 1.3 which only applies to

6  a violation of 1960 with respect to the registration

7  requirements.

8          Unfortunately, I don't have the information he pled

9  guilty to in front of me, but I think that we structured it

10  that way as well, where it would refer to that subsection and

11  not just 1960 more broadly.  But, unfortunately, I don't have

12  it with me.

13          THE COURT:  Assuming that Section 2S1.1 applies, the

14  Court has independently calculated the offense level and

15  criminal history category and agrees that Mr. Fabio's offense

16  level would be 15 and the criminal history category would be I.

17  The Court notes that if 2S1.3 applies, then that would reduce

18  the defendant's offense level to 9 and the criminal history

19  category would remain at I.  And so the Court has calculated

20  both of those.  And under the circumstances, given that the

21  guidelines are advisory, and that both the government and the

22  defendant are in agreement that a downward variance would

23  apply, and that variance would apply in either calculation, the

24  Court will proceed to evaluation of the 3553(a) factors.

25          There is no basis for a departure here, but after

P2L8FABS

1    calculating the guidelines and the potential departures, I am

2    required to consider the relevant factors set out in 18 U.S.C.,

3    Section 3553(a), to ensure that I impose a sentence sufficient,

4    but not greater than necessary, to comply with the purposes of

5    sentencing outlined in subparagraph (2).

6        I am going to ask now for the government to make any

7    final statement you would like.  And I have a particular

8    question for you here, which is, the government has recommended

9    a sentence of three months of incarceration.  And understanding

10   the reasons for that, and I am sure you're going to go into

11   them now, why would a sentence of not just supervised release,

12   but supervised release with an equivalent or longer term of

13   home confinement, as is suggested by the defense, not be

14   sufficient but no greater than necessary to fulfill the

15   purposes of sentencing in the government's view?

16       MR. GIANFORTI:  Your Honor, I guess to start, we were

17   going to ask for that as sort of a fallback position if you

18   were inclined not to give an incarceratory sentence.  So to the

19   extent that you ultimately don't impose one, we would ask for a

20   period home confinement along with supervised release.  I think

21   it is especially appropriate for this defendant since he does

22   not appear to be working.  So home detention or home

23   confinement would allow him to continue to work.  But let me

24   get back to your original question about incarceration.

25       Your Honor, this is a very serious case, and I think

P2L8FABS

1    there might be some tendency to think of it as sort of a

2    victimless case.  We are talking about cash just moving from

3    New York City down to the Dominican Republic.  But I think we

4    can't lose sight of the fact that this is money that is used to

5    fuel the fentanyl trade.  Our cooperator, who is the ringleader

6    of this money laundering organization, was also somebody that

7    we charged with fentanyl distribution; he had pills that had

8    fentanyl in them.

9         So this is very serious conduct.  And while it may

10   have been intermittent and the PSR doesn't say, nor do I have

11   evidence to suggest, that this defendant was doing this

12   constantly, like this was his main source of income, other than

13   being a flight attendant, but he did it over an extended period

14   of time.  Six years is a long time to be doing this.

15        And if we look at the other cases, which I know you

16   are aware of, before Judge Abrams and Judge Buchwald, in the

17   government's view, Judge Abrams got this case right, got the

18   balance right here.  Because the government would acknowledge

19   that Mr. Fabio, like all of these flight attendants, frankly,

20   had a lot of difficulty in his life, and these are difficult

21   decisions to make because you have sympathetic, otherwise

22   law-abiding defendants, who have been employed for long periods

23   of time, etc., but on the other side of the scale, you have all

24   of this very serious conduct.  And the reason I say I think

25   Judge Abrams got the balance right is because Mr. Fabio is very

P2L8FABS

1    similarly situated to Charlie Hernandez, the other flight

2    attendant.  I expect that you will hear about Charlie Hernandez

3    having a higher guidelines range, and that's true, but I will

4    share with you why that is.

5         So, in all of these cases, in an effort to get them

6    resolved quickly, we held every individual flight attendant,

7    which there are five, responsible for the amount of money that

8    we could sort of most readily prove if we were to go to trial.

9         So by that I mean, principally, we had a cooperator

10   giving money to these flight attendants, with Mr. Fabio

11   $60,000.  We did it one time.  So that was sort of an incident

12   that we controlled because he was working for us, and that is

13   what we held him responsible for.  It was just that 60,000 as

14   opposed to this estimated $1.5 million.  And the exact same

15   thing happened with Mr. Hernandez.  Just the facts in that case

16   were that -- actually, before the cooperator was charged, we

17   became aware that he was handing off $120,000 in cash to Mr.

18   Hernandez, which he basically broke in half.  He gave a little

19   over $60,000 to Sarah Pujols, who was sentenced by Judge

20   Buchwald.  She got caught by CBP because we stopped her because

21   we knew this was happening.  And Mr. Hernandez, as far as we

22   know, just kept that $60,000, or maybe he found another

23   opportunity to run it down to the Dominican Republic.

24        So, it is true that Mr. Hernandez had a higher

25   guidelines range, by virtue of the fact that we held him

P2L8FABS

responsible for $120,000 which put him up a rung or two in

terms of the guidelines, but at bottom, the conduct here was

exactly the same.  Mr. Hernandez may have been doing this

slightly longer than Mr. Fabio, but was also doing it not all

the time, intermittently, for a little bit of extra income, and

the cooperator there estimated that Mr. Hernandez had done

something like $2.5 million.  But frankly, I think, these are

sort of finger-in-the-wind-type numbers for the cooperator.  He

is giving these people usually about $60,000 a shot, and he's

doing it with multiple people.  It's not like he is keeping a

ledger of any of this stuff.  He is a pretty sophisticated guy,

who is actually an accountant by background, but it's not like

he's keeping detailed records of every single money run.

So, in my mind, Mr. Hernandez and Mr. Fabio, and

frankly all these flight attendants, are really exactly

similarly situated, and they all have, really all of them have

sort of difficult backgrounds.  And it just seems inconsistent

to me to hold Mr. Hernandez responsible and put him in jail for

three months and nobody else gets incarcerated.  That just

seems unfair across the board.

But to get even deeper into your question, your Honor,

I think there is really a serious need here for general

deterrence, because I suspect that this kind of conduct is

going on quite broadly across the airline industry.  Judge

Buchwald asked me whether TSA has tightened things up.  I don't

P2L8FABS

1    know the answer to that question, and obviously I don't control

2    it.  But I do know that this seems to have been, at least up

3    until recently, a fairly easy way for people to make a little

4    extra money.  I am not saying that anybody got rich here.  I am

5    not saying that Mr. Fabio did this to fuel some extravagant

6    lifestyle.  It sounds like he actually genuinely needed the

7    money, and I recognize that that's mitigating.  But I think

8    there will remain a temptation to engage in this kind of

9    conduct, unless people know that there are very serious

10   consequences, including a brief period of incarceration.  And

11   truly a brief one.  We go below not just the guidelines, but

12   below even what probation recommends here.

13        So, I think it's a token sentence.  Obviously, it's

14   significant to go in jail for any period of time, but we are

15   not asking for a guideline sentence here.  We are asking for

16   something that we think is reasonable and would send a message

17   more broadly that this conduct was serious.  Whereas, home

18   confinement, especially for a person who is not working -- it

19   doesn't sound like there is a lot going on in his life he is

20   going to miss out on if he has to stay inside for certain hours

21   of the day.  I just don't think that that is the kind of

22   sentence that is going to send a message that, you can't do

23   this, this isn't right.

24        So if you have any other questions for me, I am happy

25   to respond.

P2L8FABS

1      THE COURT:  A couple of other questions, which is,

2   based on how you described the conduct with respect to

3   Mr. Hernandez, did he have a different role in this enterprise

4   that was more along the lines of a managerial or directing

5   role, meaning that he was working with other flight attendants

6   and kind of a go-between, in a way that Mr. Fabio was not?  Or

7   is that not an accurate way to look at it?

8      MR. GIANFORTI:  So, in the original cases that were

9   brought, Mr. Hernandez and Ms. Pujols were on the same

10  complaint and they were charged with a conspiracy to run an

11  unlicensed money transmitter.  Similarly, Mr. Fabio and

12  Mr. Torres were on a complaint and charged with a conspiracy.

13  So my understanding, from my involvement in other cases -- I

14  don't think this is reflected in the PSR and I don't want it to

15  unduly sway you, but my understanding is that Mr. Fabio brought

16  Mr. Torres into this money laundering organization, but to say

17  that he was a manager I think would not be accurate.  I think

18  all of these people are essentially -- you have our cooperator

19  up here, and then you have all the mules down here, essentially

20  at the same level.  There is not some middle management layer

21  where somebody is directing other flight attendants.  There was

22  a conspiracy element, but I wouldn't say there is a managerial

23  element.

24      THE COURT:  Understood.

25      Then, you said this in front of Judge Abrams and then

P2L8FABS

```
 1    again in your memorandum, but I think the way you put it is,
 2    the prison will attend to the defendant's needs and accommodate
 3    this short sentence.  What did you mean by that?
 4              MR. GIANFORTI:  All I meant by that, your Honor, is
 5    that the Bureau of Prisons has medical staff, it has
 6    psychological staff.  It's not obviously his preferred medical
 7    care or psychological care, but I think it's important for me
 8    representing the government to stand up for the Bureau of
 9    Prisons.  They take care of people of all manner of medical and
10    psychological conditions every single day.  So to suggest that
11    Mr. Fabio's ongoing need for therapy, or for psychotropic
12    drugs, or whatever it is, is going to go totally unmet, if he
13    is briefly in the custody of the Bureau of Prisons, I don't
14    think is accurate.  That's all I meant by that.
15              THE COURT:  Thank you very much.
16              Ms. Scolari.
17              MS. SCOLARI:  Yes, your Honor.  I guess I will start
18    with addressing some of the points that your Honor raised.
19              I think it's really important to distinguish between
20    Mr. Fabio and Mr. Hernandez for several reasons.
21              In her submission, Ms. Pujols' lawyer talked about how
22    she got involved in doing this to help a friend.  So Mr.
23    Hernandez was the one that brought Ms. Pujols into it, and she
24    apparently thought she was helping a friend, at least
25    initially.
```

P2L8FABS

1          Mr. Hernandez is alleged by the government to have

2     brought a million more dollars.  That's a lot more money.  It's

3     not a small amount of money.  It's a million more.

4          Mr. Hernandez may have had a difficult life, but the

5     difference here is that Mr. Fabio has been struggling with

6     mental health issues most of his life.  As an adult, it came to

7     an extreme point when he fell down on the sidewalk and had a

8     seizure.  This has been documented from probation with medical

9     information.  They couldn't find a neurological or medical

10     reason.  He was determined to have had extreme anxiety and it

11     was a panic attack.  That's quite a bit different than Mr.

12     Hernandez needing the money for whatever he needed it for.

13          Mr. Fabio has made great efforts to improve on his

14     mental health situation and has used the money that he got to

15     pay for therapy.  And you have his history before you.

16     Initially, he was getting free therapy, but it only lasted for

17     a short period of time.  And, clearly, it was not addressing

18     the issue because it was thereafter that he had the seizure.

19          In addition, Mr. Hernandez did have a higher guideline

20     because of the amount of money that he was given.  The amount

21     of money that Mr. Fabio was given was half.  So there is a

22     little difference in that sense.

23          I think that the idea, going to the BOP, that the

24     Bureau of Prisons will deal with Mr. Fabio's needs is just

25     illusory.  In every case, where I have a client with medical

P2L8FABS

1    issues or psychiatric issues, the government has stood up and

2    said the BOP will address it.  They don't.  My experience is

3    kind of shocking, your Honor.  Just recently I had a client who

4    after arraignment went to jail, MDC, with a medical order

5    directing that she needed five medications.  The Bureau of

6    Prisons, in the MDC, in its wisdom, decided that, we are going

7    to give you two of those medications, because we either don't

8    have what the judge ordered that you have been taking, or we

9    think it's too expensive, or we are going to substitute what we

10   think is better because it's what we have on hand.

11        I had a client that went in after a gastric bypass,

12   and there are Bureau of Prison protocols for somebody who has

13   got a gastric bypass, that they are specifically supposed to be

14   given food in a particular way, particular kinds of food, and

15   certain amounts of time.  All of that was provided, attached to

16   the PSR, that went to Grand Prairie.  He was sent to a jail

17   where they completely ignored those protocols.  And Judge

18   Rakoff was assured by the government, these are the protocols,

19   the Bureau of Prisons will follow them.  They don't do it.

20        The incidents of people not getting cancer treatments,

21   that is causing them to die, honestly, in the Bureau of

22   Prisons, it's really shocking.

23        There is no question that Mr. Fabio will not get

24   therapy.  The therapy that he has been going to twice a week,

25   sometimes three times a week, is what helps keep him on an even

P2L8FABS

1    keel.  It will help him go out and find a job, which he intends

2    to do.  As soon as this case is over, he is going to look for

3    work.  If he were given home detention, he will be allowed, if

4    the Court permits it, to look for and find work.  He is an

5    intelligent, well-spoken, educated man.  He will find work.

6    It's not going to be the job he loved, but he will find work.

7    So it's not as if he is going to sit home and do nothing.  He

8    is going to go to therapy, he is going to keep on working on

9    his mental health, and he will find a job.

10           But what they will do in jail is, they will give him

11   some medication, because they give out antidepressants, but

12   they will just give him whatever they think he should get; not

13   based on what he was getting, but what they think is the most

14   effective, in terms of their cost considerations, which is a

15   huge issue now, and what they have available.  One of the

16   things that your Honor has seen in the press, because it's

17   happening in every single agency, is there are cuts.  So they

18   are going to be losing staff.  The BOP is going to be losing

19   money.  Certainly this administration is not going to

20   prioritize medical needs or mental health needs of inmates.

21   They are looking to cut costs.

22           Your Honor, in terms of deterrence.  I understand the

23   government wants to send a message.  The clearest message that

24   has been sent, that I would suggest to the Court is the

25   greatest general deterrence of flight attendants, is the

P2L8FABS

1    arrests.  The arrests were publicized and people immediately

2    lost their jobs.  They lost their jobs without being convicted.

3    They lost their jobs, they lost health insurance, they lost

4    benefits.  That's the biggest deterrent.  Not, Oh, I might get

5    caught and I might go to jail for three months.  But, I am

6    going to lose a job, at a time when it's really hard to get

7    another job.  I will never get another job in the airline

8    industry, ever.  And, certainly, if I lose my job because I do

9    this, I will have difficulty getting another job.  That's the

10   real deterrent here.  To suggest that people are watching this

11   case to see how much time Mr. Fabio gets, I think it's not

12   realistic.  And as Judge Buchwald mentioned, she sentenced

13   somebody to 30 years on a fentanyl case.  There was no

14   publicity.  There was no indication that anybody has seen or

15   was watching it.

16         So, honestly, Judge, the greatest deterrence is what

17   happened at the arrest, that was really publicized, versus what

18   happens in this courtroom.

19         I think everybody agrees that Mr. Fabio doesn't need

20   specific deterrence.  Every letter that was submitted talks

21   about what a good person he is.  And in many letters, people

22   have shared, he has talked about what he did, he has admitted

23   to people how bad it was.  He is ashamed.  He is incredibly

24   remorseful.  So I don't think anybody thinks he needs specific

25   deterrence.

P2L8FABS

1           I hope I have answered the Court's questions.  I do

2    think the Court's consideration of home detention is the

3    appropriate sentence here.  It is a harsh sentence.  Even

4    supervision has been determined by the Supreme Court to be a

5    harsh sentence.  He will not be able to travel outside of the

6    district on supervision for the first, I think it's 18 months.

7    If he wants to go to Connecticut to visit a friend, if he is

8    not on home detention, he can't do it without permission.

9    There is a real restriction.

10           But, your Honor, beyond that, home detention is also

11   harsh, because you can't spend time with a friend, you can't go

12   to dinner, you can't take a walk.  He won't be able to take his

13   dog for a walk.  His dog, who is a big part of his support

14   system, will go to live with somebody else.  Because home

15   detention is strict.  They don't allow people to do anything

16   that is remotely social, which to some extent for Mr. Fabio has

17   been part of his support system.  But he will be able to go to

18   therapy, which is crucial.  And he will be able to look for a

19   job, which is what he needs to do to stay on the right track

20   and continue his life as a law-abiding person.

21           The government mentioned that their recommendation is

22   far lower than that of probation.  But the probation

23   recommendation was made before the government recommended three

24   months for the two related cases, and the recommendation was

25   made before Ms. Pujols got no jail and Mr. Hernandez got three

P2L8FABS

1    months.  So I think now, if the government wants to talk about

2    probation's recommendation, probation might have a very

3    different recommendation in light of the facts that have now

4    come out.

5         Unless the Court has anything else, I thank you.  I

6    know you have read everything very carefully.

7         THE COURT:  Well, kind of getting down to brass tacks

8    here, you pointed to the probation recommendation of ten months

9    of incarceration.  And I am not asking you to agree with this,

10   but there are a lot of courts and a lot of offices in this

11   country that, for an offense related to drug trafficking, would

12   not have proposed a sentence of three months of incarceration.

13   And I understood from the government's submission here that

14   their meaningful and significant recommendation of a downward

15   variance was accounting for these very compelling mitigating

16   circumstances for Mr. Fabio and for the other flight attendants

17   that are at issue here.

18        So that's something that I am thinking about, which is

19   that it's not purely in trying to figure out whether it should

20   be three months, as the government proposes, or time served, as

21   you're proposing, but rather, determining what the actual

22   sufficient, but not greater than necessary, sentence would be

23   in light of the sentencing factors.  And I do appreciate that

24   the parties have, through their submissions, come together in a

25   way that the Court very rarely sees in cases that it handles.

P2L8FABS

```
1    And I am sure you have had this experience, too, where despite

2    very compelling mitigating circumstances, the government comes

3    in and, because of the seriousness of the offense, advocates

4    for a very high sentence.  Here, in a refreshing way, the

5    government has taken account of the mitigating circumstances.

6           So, what do you make of that?  Under those

7    circumstances, and the fact that this is an offense related to

8    drug trafficking, how do we deal with the fact that, even if

9    general deterrence is not a reason for an incarceratory

10   sentence, for the reasons that you say, there is promoting

11   respect for the law, recognizing the seriousness of the

12   offense, and providing just punishment for the offense, which

13   are other purposes that I am required to consider?

14          MS. SCOLARI:  So, your Honor, I think the fact that

15   the government recommended three months for each of the

16   defendants, two who have been sentenced and now for Mr. Fabio,

17   is not really doing the Court's job.  I will tell you why.  The

18   government doesn't make a sufficient distinction between Mr.

19   Fabio and Mr. Hernandez.  They just don't.  They say, Well, he

20   got three months and that's what we are going to recommend

21   here, without being more specific, because of the specific

22   mitigating factors.

23          I submit to the Court that there is a difference, even

24   though it's not tremendous, between what Mr. Hernandez did and

25   what Mr. Fabio did.  A million dollars is a difference.  But
```

P2L8FABS

1    beyond that, there are mitigating factors that exist, that I

2    have really laid out through the therapist letters and the

3    history, in Mr. Fabio's case that did not exist in Mr.

4    Hernandez's case.  Mr. Hernandez did not give a reason that I

5    think is compelling.  It doesn't excuse what he did, but is

6    compelling in terms of why the money was needed and what it was

7    used for.  It was used for individual good, but it wasn't

8    greed, it wasn't somebody who just said, I am not making enough

9    money.  And I don't know what, if any, mitigating factors the

10   government was really talking about in terms of Mr. Hernandez,

11   except that he had no criminal history and he had a job history

12   that was a valid job history before he got caught doing this.

13           So, there is a distinction that is left for the Court

14   to make.  And I think that distinction is fine enough or is

15   significant enough to go from three months to no jail, three

16   months to home detention, which it's no picnic, Judge, it

17   really isn't.  People can't grocery shop without permission.

18   They can't do laundry without permission.  They have to make

19   sure that going to the trash chute in the building is within

20   the area that they can travel with the ankle monitor.  He is

21   going to have an ankle monitor.  So it's not nothing.

22           But, also, what has been submitted to you, in terms of

23   what his therapists have said, is for Mr. Fabio to go to jail,

24   it's very different.  He is not somebody that tolerates

25   ordinary stress well.  They are worried about the deterioration

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P2L8FABS

1    of his mental health.  When someone goes to jail, if you allow

2    him to voluntary surrender, what he will have to do is he will

3    have to go to a prison.  And every single time he gets a visit

4    he is going to be strip-searched.  He is going to be treated as

5    if he is a child.  He will be told when to wake up, when to go

6    to bed, when to eat.  He will be limited in terms of what he

7    can eat.  Every aspect of his life is going to be controlled.

8    We in the system, people routinely go to prison and we don't

9    think about how they have to live.  Mr. Fabio is going to have

10   to live in close quarters with another individual who may be

11   his roommate.  Who knows what that person is going to be like.

12        Now, I can tell your Honor, from my experience, he

13   will go to a camp.  He is not likely to be locked up with

14   violent inmates.  But he could very well be locked up with

15   somebody who says, I'm not getting enough phone minutes, I am

16   going to have an illegal phone in my cell, or an illegal phone

17   in my room.  And if that person gets caught with a phone, how

18   does that impact on Mr. Fabio?

19        You know, the details of people that live in even the

20   lowest security facilities, camps, would be abhorrent to us.

21   And we don't think about that because it's just part of the

22   system, people go to jail, it's part of what has to happen.

23   But your Honor has the ability here to decide that, for this

24   particular man, it is too harsh; for this particular man, it is

25   beyond what is necessary and sufficient.

P2L8FABS

1          Now, we talk about punishment.  There is no lack of

2     public respect for the law when someone's situation is

3     sufficiently distinguished so that it would be particularly

4     harsh for them, where the reason they did it is not so

5     terrible.

6          The other thing is the government talks about

7     fentanyl.  Mr. Fabio had no idea that this had anything to do

8     with fentanyl.  The last time he was given money, when he was

9     being recorded, the informant said something that alluded to it

10    being drug money.  Fentanyl was never mentioned.  Everybody

11    knows fentanyl is horrific.  Nobody with Mr. Fabio's

12    sensibilities would be knowingly involved in moving fentanyl

13    drug money.  Everybody knows people die of fentanyl all the

14    time.  It's horrendous.

15         THE COURT:  To be clear about this, you agree that Mr.

16    Fabio knew that this money was being smuggled as part of the

17    drug trade, right?

18         MS. SCOLARI:  He was absolutely told the last time he

19    was given the money.  There is no doubt about that.  There was

20    evidence of it.  It was never discussed before.  I am not

21    saying he thought it was okay money.  I am not saying that.

22    But it wasn't discussed, your Honor.  But there is no dispute

23    that at the last time, every single person that was set up by

24    the informant and recorded was told, to be sure the government

25    would have the two points, this is drug money.  So there is no

P2L8FABS

1    dispute about that.

2            But to now bring up the specter of fentanyl, which is

3    horrendous, it's very, very serious, it makes it seem like a

4    far more insidious crime than I think legitimately it is.

5            MR. GIANFORTI:  Your Honor, if I could be heard at

6    some point, I would appreciate it.

7            THE COURT:  Just give me one second.

8            Mr. Gianforti.

9            MR. GIANFORTI:  I have been trying to avoid to share

10    some of the details that I know about Charlie Hernandez's case,

11    but it feels important in light of what Ms. Scolari has raised

12    here.  And I am going to try to do this as delicately as I can

13    do it.  There are profound differences, in fact, between Mr.

14    Hernandez's health and Mr. Fabio's health, and Mr. Hernandez is

15    in a much worse spot than Mr. Fabio is.  And again, I am going

16    to try to be delicate here.

17            For one, Mr. Hernandez suffers from a chronic

18    autoimmune disorder that I will just leave at that.  Secondly,

19    in terms of his mental health, and I really didn't want to

20    share this but I will now, Mr. Hernandez has a prior suicide

21    attempt.  So this is a man who has struggled with his mental

22    health in a way that, I am not trying to diminish Mr. Fabio's

23    struggles with mental health, by any stretch, but to compare

24    the two is just not right.  And to keep this man out of prison

25    because it will be stressful for him, he has got no one to

P2L8FABS

1    blame for that but himself.  He put himself in this position.

2    He was moving drug money.  And, yes, he didn't know explicitly

3    that it was fentanyl, but he also wasn't asking.  I think this

4    is a clear case of willful blindness.

5          THE COURT:  This is what I was trying to look up.  But

6    Ms. Scolari suggested that, even in terms of his knowledge that

7    this was money for the drug trade, that he was only aware of

8    that at the end.  Was that accurate?

9          MR. GIANFORTI:  Let me just look at the PSR, your

10   Honor.

11         MS. SCOLARI:  Your Honor, just to jump in, if I can.

12   It doesn't make a difference if he was told every single time,

13   legally, or if he was told the last time.  The last time, and

14   the amount of money that he pled to in relation to that last

15   time, he was told, there is no disputing that.  So I am not

16   suggesting the two points don't apply.  But I think that --

17         THE COURT:  Hold on.  I am trying to understand what

18   the facts here are.  And I am looking at paragraphs 28 and 29

19   of the PSR, which indicate that Mr. Fabio was aware that these

20   were proceeds of drug trafficking, narcotics proceeds.  The way

21   I understood the PSR and the parties' prior dealings here was

22   that that was not a contested point, that he knew they were

23   narcotics proceeds.  But I think that there was also agreement

24   that Mr. Fabio was not aware specifically that they were

25   fentanyl proceeds.  Am I right about that, in terms of how I am

P2L8FABS

1  looking at this?

2         MS. SCOLARI:  If you're asking me, the answer is yes.

3         MR. GIANFORTI:  I agree with that.

4         So, this example in paragraph 29, this is the most

5  concrete example that I have right now, because it was recorded

6  as Ms. Scolari says, of Mr. Fabio knowing that this was drug

7  money of some kind, if not knowing exactly what drugs were

8  behind it.  And, frankly, I am just not in a position right now

9  to tell you if the cooperator would say Mr. Fabio knew much

10  earlier.  This is just sort of the most concrete example for

11  the PSR.  But, your Honor, I think you can reasonably infer, or

12  that Mr. Fabio should have been able to reasonably infer that

13  being asked to bring tens of thousands of dollars in cash from

14  New York to the Dominican Republic, a known narcotics hotspot,

15  what did he think this money was for?  Even if it wasn't as

16  crystallized as it was in 2023, I just find it very hard to

17  swallow that Mr. Fabio didn't know or have some suspicion that

18  this is exactly what was going on from the moment that he

19  decided to do this the first time.

20         THE COURT:  Thank you.

21         MS. SCOLARI:  Your Honor, I don't have a response to

22  that.  But what I would do is go back to what your Honor has

23  said.  It's a matter of what sentence is sufficient but not

24  greater than necessary.  And I again would urge the Court that

25  home detention versus a period of time in jail, however short,

P2L8FABS

| 1 | home detention would be sufficient and not more than necessary. |
| 2 | Jail in this instance I think is more than necessary. |
| 3 | That's all I have.  Thank you. |
| 4 | THE COURT:  Thank you, Ms. Scolari. |
| 5 | Mr. Fabio, I have read the many, many letters in |
| 6 | support of your position here.  I am happy to hear from you. |
| 7 | You don't have to say anything, but if there is anything you |
| 8 | would like to say, I am here to listen to you. |
| 9 | You can remain seated.  You don't need to stand up. |
| 10 | Whatever is more comfortable for you. |
| 11 | THE DEFENDANT:  I am deeply remorseful for the actions |
| 12 | that I have taken and the causes and effects it has affected in |
| 13 | my community and in this country in general. |
| 14 | THE COURT:  Thank you very much. |
| 15 | Now, I have considered each of the purposes of |
| 16 | sentencing and factors outlined in Section 3553(a).  There are |
| 17 | undeniably powerful circumstances in Mr. Fabio's background |
| 18 | that justifiably warrant a variance downward from the |
| 19 | guidelines range here, as the government recognizes. |
| 20 | Mr. Fabio, you had a tough upbringing and you had a |
| 21 | lot of personal struggles that you had to deal with, and you |
| 22 | didn't just deal with them, you overcame them.  And you have no |
| 23 | prior criminal history.  This isn't a case where this is just a |
| 24 | string of things that has happened for a very long time.  As |
| 25 | Ms. Scolari points out, you have suffered years of abuse, both |

P2L8FABS

1    physical and verbal, and you overcame those challenges to lift

2    yourself up.  And I haven't had a case with this many letters

3    in support of a defendant in a case like this.  I mean, in any

4    case, really.  And what that shows me is that you overcame the

5    struggles that you were going through, not just to lift

6    yourself up but to also lift up the people around you.  And

7    that's important.  I keep that in mind.

8         I have no doubt that you are deeply remorseful for

9    what has happened here, and I don't believe that you're someone

10   who is going to reoffend.  So I take account of all those

11   factors.  But the Court has to consider the seriousness of the

12   offense, the need to provide just punishment, and the interest

13   in deterring others from committing what is a very

14   difficult-to-detect crime.  This conduct went on, this was your

15   first criminal offense, but even if there were some gaps, it

16   occurred over a very long period of six years.  And in terms of

17   the money that's involved, it may be based on an estimate from

18   the cooperator here, but the amount was significant by any

19   measure.  It wasn't just the $60,000.  There was more.  And the

20   estimate, at least provided by the cooperating witness, was

21   that it was in excess of a million dollars, $1.5 million.

22        To smuggle those funds, Mr. Fabio used a position of

23   trust to evade detection.  And he had a lot of chances over the

24   years to say, No, I'm not going to do that, I'm not going to

25   continue this conduct.  But he did not take those

P2L8FABS

1    opportunities.  And as we have discussed, there is no dispute

2    that Mr. Fabio was aware, and certainly should have been aware,

3    that the proceeds here were of the drug trade.

4         And, Ms. Scolari, you made the point that he may not

5    have specifically known that it was fentanyl, but, equally, he

6    didn't inquire as to what drugs were at issue.  You said he

7    wouldn't have done it if these proceeds were arising from the

8    fentanyl trade.  He had a lot of chances to ask what was going

9    on, to ask those questions, to figure it out.  And I don't have

10   to tell anybody here that fentanyl, in specific, is a killer.

11        And, Mr. Fabio, you have all these people who are here

12   in court today, and all of these letters from people who love

13   and support you, and fentanyl each year takes the lives of tens

14   of thousands of people who are just like you, who have loved

15   ones and family members and friends, who are never going to see

16   that person again.  And that's why, as the government has

17   noted, this is a serious offense, something that we have to all

18   try to stop and do whatever we can to help make it stop.

19        The government points out, despite, Ms. Scolari, what

20   you say about general deterrence, and there is a lot of weight

21   to what you say, that it's hard to measure, it's hard to know

22   what effect some of these things will have to other people.

23   But here, as Judge Abrams noted, we have a small community of

24   people who are uniquely in a position to be influenced by what

25   happens to their colleagues, and if there is a way of stopping

P2L8FABS

1    some of this money from going through these channels, if there

2    is a way to slow the drug trade, this trade that's killing tens

3    of thousands of Americans each year, then that's one of the

4    purposes that Congress says I have to consider.  And I do give

5    it weight similar to the weight that Judge Abrams gave it in

6    her case with Mr. Hernandez.

7            And the Court also takes note of the probation

8    department's recommendation.  That recommendation of ten months

9    of incarceration many would say would be the sentence that

10   would be sufficient but not greater than necessary to account

11   for the purposes of sentencing here.  And there are a lot of

12   courts, a lot of judges who would agree with the probation

13   department.  In this case, the government, mindful of all of

14   the circumstances that Ms. Scolari has indicated, and that are

15   reflected in these letters, has proposed a lesser sentence.

16   But make no mistake, we are not in the category where the only

17   sentence that could possibly be justified would be three months

18   of incarceration and no one could possibly go above that.  As

19   the probation department's recommendation shows, given the

20   severity of the conduct, the time period at issue, the amount

21   of money that was smuggled, and the underlying unlawful

22   activity, one could certainly say that the sentence that would

23   be sufficient but not greater than necessary would be a

24   sentence even above the three months.

25           However, the Court has to consider, as one of the

P2L8FABS

1    factors in Section 3553(a), the need to avoid unwarranted

2    sentence disparities among defendants with similar records who

3    have been found guilty of similar conduct.  Here, the Court

4    takes account of Mr. Hernandez's sentence and Ms. Pujols's

5    sentence, and the Court, for the reasons explained by the

6    government, believes that this is similar to the situation of

7    Mr. Hernandez and that a sentence of three months of

8    incarceration would be the appropriate sentence here.

9         As for Ms. Pujols, the Court has reviewed the record

10   in that case, and the sentencing transcript before Judge

11   Buchwald, and has taken into account the factors that Judge

12   Buchwald pointed to.  There are certain differences in terms of

13   the two cases.  But the reality here is that the Court does not

14   believe, based on the facts and circumstances of this case,

15   that a sentence of simply supervised release, that it would be

16   sufficient here to account for all the purposes of sentencing

17   that Congress has required the Court to consider.

18        So for that reason, the Court believes that the

19   appropriate sentence here, the sentence that would be

20   sufficient but not greater than necessary, is a sentence of

21   three months of incarceration.

22        I will now state the sentence I intend to impose, but

23   the attorneys will have a final opportunity to make legal

24   objections before it is finally imposed.

25        The Court will sentence Mr. Fabio to three months of

P2L8FABS

1    incarceration.

2          Ms. Scolari, do you have a recommendation that the

3    Court would make to the BOP concerning the circumstance of

4    incarceration, the facility?  I am happy to make any

5    recommendation that you would suggest.

6          MS. SCOLARI:  I know this is unusual, but what I would

7    ask the Court to consider doing, if you would, since you're

8    referring to the probation recommendation of ten months, is

9    whether or not probation would recommend something different in

10   light of the government's recommendation of three months and

11   the sentences that have been imposed, which is one sentence of

12   no time and one sentence of three months.  Probation did not

13   have the full information that is now available.  And a

14   different recommendation could well have been made other than

15   ten months.  And since your Honor is pointing to that ten

16   months, I think it would be appropriate to get additional input

17   if your Honor would consider that.

18          THE COURT:  Well, to be fair, I am noting that

19   probation made the recommendation of ten months, but I am not

20   imposing a sentence that is in accord with the probation

21   department's recommendation.  But if you're simply asking

22   whether I would inquire with probation as to what their

23   recommendation would be, in light of everything that they have

24   heard, I am happy to do that.  I will do that now.

25          MS. SCOLARI:  I appreciate it, your Honor.

P2L8FABS

 1              THE COURT:  Sure.

 2          So let me ask probation.  Given what you have heard,

 3   and Ms. Scolari and the points that she has made concerning the

 4   timing of the probation department's recommendation, and the

 5   subsequent recommendation by the government, along with the

 6   sentences in the two prior cases, what is the probation

 7   department's view as to the appropriate sentence here?

 8              MS. GEISER:  Your Honor, we would feel that Mr. Fabio

 9   is equally culpable as Mr. Hernandez.  We obviously were not

10   privy to his variance factors, as I did not write the report

11   for Mr. Hernandez so I am not fully aware of his background.  I

12   do know that Mr. Fabio has been compliant with his treatment.

13   I know those also weigh heavily on his factors.  I believe that

14   whatever sentence -- when we made these recommendations, I was

15   in line with the officer who had done Mr. Hernandez's report.

16              THE COURT:  Okay.  And now?

17              MS. GEISER:  I would recommend the same sentence as

18   Mr. Hernandez.

19              THE COURT:  Meaning of three months?

20              MS. GEISER:  Yes.

21              THE COURT:  So, Ms. Scolari, I understand why you

22   wanted me to raise that point with the probation officer.  So

23   it's fair to note that probation's recommendation would be in

24   line with the government's proposal.

25              MS. SCOLARI:  Thank you, your Honor.

P2L8FABS

1    THE COURT:  The point that I was making is just that

2    one might take the position reasonably, under these

3    circumstances, given the nature of the conduct, etc., that a

4    sentence of ten months of incarceration would be sufficient but

5    not greater than necessary to satisfy the purposes of

6    sentencing.  But to be clear, the Court's view is that the

7    proposed sentence of three months is the sufficient but not

8    greater than necessary sentence, regardless of what the

9    probation department's recommendation was or is at this point.

10   But it was a helpful clarification so I do appreciate it.

11        Now, back to the sentence.  So the sentence is three

12   months of incarceration.

13        But, Ms. Scolari, my real question is to understand

14   what recommendations you believe would be beneficial for Mr.

15   Fabio.

16        MS. SCOLARI:  Your Honor, I don't know all of the

17   camps that might be available to Mr. Fabio because I don't know

18   where there will be space.  So what I would ask the Court to

19   recommend is that Mr. Fabio be designated to a camp, which I

20   believe will be consistent with his security score which is

21   necessary, and that the Court recommend a camp in Pennsylvania

22   specifically.  And the reason for that is the nearest camp here

23   is either in Otisville or Fort Dix.  They are both extremely

24   crowded.  It's very hard for people to find space to get in

25   there.  And they are understaffed and people don't always get

P2L8FABS

1    what they need.  Schuylkill is a camp in Pennsylvania that your

2    Honor might suggest.  I have had clients go there and do as

3    well as they can there.  So maybe for a specific recommendation

4    your Honor could indicate Schuylkill, which is a little

5    difficult to spell and I don't want to do it on my feet.

6            THE COURT:  I can find the spelling.

7            So the Court will recommend that Mr. Fabio be detained

8    at a camp, and that it be a camp in Pennsylvania.  Preferably,

9    the Schuylkill facility, Ms. Scolari, is that fair?

10           MS. SCOLARI:  Yes, your Honor.

11           The other request that I have is that you permit Mr.

12   Fabio to self-surrender.

13           THE COURT:  And what time period do you believe would

14   be appropriate?

15           MS. SCOLARI:  I think two months.  It usually takes

16   about that long for the designation to come through.  And

17   sometimes I have to come back to the Court and ask for an

18   extension because we haven't gotten the designation, but I am

19   hoping that that will be sufficient.

20           THE COURT:  Have you already spoken with Mr. Fabio

21   about this?  I am flexible.

22           MS. SCOLARI:  He needs to get his affairs in order.

23   He has an apartment and other obligations.  If you give me a

24   minute, I will speak with him.

25           THE COURT:  Sure.  Thank you.

P2L8FABS

 1             (Counsel confers with defendant)

 2             MS. SCOLARI:  Your Honor, he is saying right now he

 3   believes two months is fine.

 4             THE COURT:  So, we will have surrender date to the

 5   facility designated by the Bureau of Prisons by 2 p.m.

 6   on -- Mr. Hernandez, can you give me the date two months out?

 7             MS. SCOLARI:  I request that it not be a Friday

 8   because sometimes there are problems on a Friday.

 9             THE DEPUTY CLERK:  Yes, your Honor.  One moment.

10             THE COURT:  Whatever the next day after a Friday would

11   be.  Let's do it on Monday, Ms. Scolari, does that sound good?

12             MS. SCOLARI:  A Monday should be fine.  Thank you.

13             THE COURT:  So it will be April 28, 2025.

14             In terms of supervised release, from the government's

15   perspective, is there a need for an extended supervised release

16   period in this case?  The recommendation is three years, I

17   believe, but is there any need for a period of supervised

18   release longer than one year?

19             MR. GIANFORTI:  Your Honor, the one thing that could

20   be helpful about an extended period is if he would have access

21   to certain services that are available while one is on

22   supervised release that probation can get him access to,

23   whether that's mental health services or the like.  But beyond

24   that, we don't think beyond a year is necessary.  We leave it

25   to your discretion.  It might be beneficial, but Ms. Scolari

P2L8FABS

1    might want to be heard on that.

2             THE COURT:  Ms. Scolari, what we can do is that we

3    could impose a period of supervised release of three years

4    subject to an application that you might make at a later time

5    if you believe that it would be beneficial to Mr. Fabio, for

6    work purposes or anything else, for him to be relieved of that

7    period.

8             MS. SCOLARI:  Your Honor, I would prefer the year.

9    And the reason I say that is Mr. Fabio is going to follow up on

10   his own with mental health treatment.  I don't think he needs

11   to be on a longer period for services in that regard.

12   Supervision is pretty onerous and if your Honor doesn't feel

13   the need for it, I would ask that you only impose a year.

14            THE COURT:  In terms of supervised release, Mr. Fabio

15   will be placed on supervised release for a term of one year.

16   He will be subject to the mandatory and standard conditions of

17   supervised release set forth in the presentence report and the

18   guidelines section 5D1.3, subsection (c).

19            Ms. Scolari, have you discussed those mandatory and

20   standard conditions of supervised release with Mr. Fabio?

21            MS. SCOLARI:  I have, but we will review them again.

22            THE COURT:  Do you have any objection to those?

23            MS. SCOLARI:  No, your Honor.

24            THE COURT:  Mr. Fabio will be further subject to the

25   following special conditions of supervised release:

P2L8FABS

1          He must submit to a search of his person, property,

2     residence, office, vehicle, papers, computers, cell phones, and

3     other devices or media used for electronic communications, data

4     storage, cloud storage, or network storage.  The probation

5     officer may conduct a search under this condition only when

6     there is reasonable suspicion that he has violated a condition

7     of his supervision or committed a new crime, and that the areas

8     to be searched contain evidence of this violation or crime.

9     The search must be conducted by a United States probation

10    officer, although other law enforcement officers may assist the

11    probation officer.  The search must be conducted at a

12    reasonable time and in a reasonable manner.  Failure to submit

13    to a search may be grounds for revocation of release.  He must

14    warn any other occupants that the premises may be subject to

15    searches pursuant to this condition.  And this condition is

16    warranted and related to the 3553(a) factors based on the

17    nature of the offense, including that the defendant smuggled

18    large amounts of cash on his person and used telecommunication

19    devices to facility that conduct.

20          Mr. Fabio must also provide the probation officer with

21    access to any requested financial information.  That is

22    justified by the same reasons.  In addition, he is subject to a

23    forfeiture requirement, and that's another justification for

24    that condition.

25          He must not incur new credit charges or open

P2L8FABS

1    additional lines of credit without the approval of the

2    probation officer unless he is in compliance with the

3    installment payment schedule.  This is justified by the

4    forfeiture that we will address next.

5         He must participate in an outpatient treatment program

6    approved by the United States Probation Office, which program

7    may include testing to determine whether he has reverted to

8    using drugs or alcohol.  He must contribute to the cost of

9    services rendered based on his ability to pay and the

10   availability of third-party payments.  The Court authorizes the

11   release of available drug treatment evaluations and reports,

12   including the presentence investigation report, to the

13   substance use disorder treatment provider.  And this condition

14   is justified by information in the materials submitted to the

15   Court, including the presentence report, concerning prior

16   alcohol and substance use.

17        MS. SCOLARI:  Your Honor, if I may be heard on that?

18        THE COURT:  You may.

19        MS. SCOLARI:  I don't think there is any issue as to

20   alcohol, and I think that's overly restrictive.  I would ask

21   that your Honor not include a requirement that he participate

22   in treatment, but that probation can require him to be

23   evaluated to determine whether or not he needs treatment.  I

24   think that's the best thing to do.  If it's determined that he

25   needs treatment, then obviously he can be required to

P2L8FABS

1    participate in a program that will be a drug treatment program.

2           THE COURT:  So, your proposal, based on those two

3    reasons that you gave, is that Mr. Fabio be evaluated by the

4    probation office to determine whether and what kind of

5    outpatient treatment program would be appropriate for him?

6           MS. SCOLARI:  Yes, your Honor.  And I also don't think

7    that he should be restricted in any way from using alcohol.

8    That's not been an issue and so I don't think it's necessary.

9    I think the standard language includes drugs and alcohol, but

10   it's not an issue here.

11          THE COURT:  Does probation or the government have a

12   position on this?

13          MS. GEISER:  Your Honor, if I may.  I understand what

14   Ms. Scolari is saying.  There is no need to change the standard

15   language of this condition.  The way that the condition works

16   with the probation office is, when Mr. Fabio returns and comes

17   for his intake on supervised release, he will be enrolled in

18   our random urine program.  So it's color coded and he will have

19   to call a telephone number, every night essentially, and twice

20   a month he will have to come in for random urine tests, and

21   that will phase out.  So as long as he is testing negative, he

22   won't be mandated into treatment unless an evaluation by one of

23   our contract providers says he requires treatment based on a

24   diagnosis, unless he starts testing positive.  So allowing this

25   condition to stand allows the probation office to re-refer him

P2L8FABS

 1    if he starts testing positive through the random urine program.

 2         MS. SCOLARI:  The difficulty I have with that is this.

 3    If somebody is trying to find a job, and they know at any

 4    moment that they have to run down and be drug tested two times

 5    a month, let's say, so they have to cancel the job interview,

 6    or if they get a job and they have just started working, they

 7    have to take a day off because they are mandated by this random

 8    condition, it's a problem.  And these random tests can go on

 9    for months.  I just think it's really more intrusive than is

10    necessary and has not been proven necessary in this instance.

11         So, although probation has a standard way of doing

12    things, your Honor can impose something different, and I think

13    that's appropriate in this case, particularly for somebody who

14    is going to get out of jail and will be trying to find a job.

15         MR. GIANFORTI:  Your Honor, I would refer you to

16    paragraphs 79 and 80 and 83 of the PSR, which are unobjected

17    to.  It's pretty clear that this defendant uses drugs and

18    alcohol to de-stress, as I believe he put it.  So I think this

19    is a totally appropriate condition.  This is not a case of an

20    individual who is a nondrinker, non-marijuana user being

21    imposed with an onerous condition.  It might not be the most

22    problematic drug usage, but it also is not problematic given

23    what I am seeing here and which is unobjected to.

24         MS. SCOLARI:  Your Honor, I don't mean to keep

25    belaboring this point.  Many of us use the legal drug alcohol

1    to de-stress.  De-stressing can be a glass of wine or two at

2    night after a difficult day.  It is not alcoholism.  That is a

3    very different issue with somebody who drinks to excess all the

4    time.  That is not the situation here.  If there is a condition

5    that says he is not supposed to drink, I think that's really

6    onerous.  So I think we are arguing over something that's

7    really not an issue because, frankly, there has never been an

8    issue, and there is no documentation of an issue, of Mr. Fabio

9    abusing alcohol.  De-stressing with alcohol is very different.

10        MS. GEISER:  Your Honor, if I may.  For the testing

11    program, the individual calls the number the night before so

12    they know the day before whether or not they have to come into

13    the probation office to test, and they can come between 8 a.m.

14    and 5 p.m.  So I feel they have a large window to come in.

15    They check in, there is a duty officer whose job is to collect

16    that sample, and then they are free to go about their day and

17    return to work.  So I believe the defendant would have the

18    opportunity to come in prior to work, after work, on his lunch

19    break.

20        Additionally, the way the condition reads, it's not

21    saying he cannot drink.  It's saying he will be tested to

22    determine whether he has reverted to using drugs or alcohol.

23    It's not saying he cannot.  And I believe that would be up to

24    the licensed treatment provider to determine if he has a

25    problematic issue with drugs or alcohol.

P2L8FABS

1          MS. SCOLARI:  One of the difficulties with people

2     being on supervision is the tendency for the rules to be

3     intrusive and micromanage somebody's life.  If he is going to

4     be tested to see if he's using alcohol and he is using alcohol,

5     he is going to come up positive.  I don't understand the need

6     for this.

7          THE COURT:  Ms. Scolari, what you're asking for is

8     that this condition be modified to say Mr. Fabio will be

9     evaluated for participation in an outpatient treatment program

10    for drugs approved by the United States Probation Office,

11    correct?

12         MS. SCOLARI:  Yes, your Honor.

13         THE COURT:  Let me restate the condition just so it's

14    clear.

15         Mr. Fabio will be evaluated for participation in an

16    outpatient treatment program for drugs approved by the United

17    States Probation Office.  To the extent that treatment is

18    approved by the United States Probation Office and authorized

19    and recommended, he must contribute to the cost of those

20    services rendered based on his ability to pay and the

21    availability of third-party payments.  The Court authorizes the

22    release of available drug treatment evaluations and reports,

23    including the presentence investigation report, to the

24    substance use disorder treatment provider.  And that is

25    justified by, as the Court previously stated, documented

P2L8FABS

1    substance abuse issues as detailed in the presentence report.

2         Before I state the condition referring to mental

3    health treatment, Ms. Scolari, is there any objection to that

4    condition?

5         MS. SCOLARI:  Yes.  Two reasons.  If he is required to

6    go to mental health treatment through a provider that the

7    probation department chooses, I think, number one, it's

8    unnecessary because he has a history of going to mental health

9    treatment and he will continue doing that on his own.  He has

10   chosen wisely to get help, and I don't think he should have to

11   go to a provider that probation requires.  One.

12        Two, probation requires a person going to mental

13   health treatment under their supervision to sign a waiver.  So

14   anything that is discussed with the treatment provider can be

15   reported to probation.  It makes it very difficult for people

16   to openly talk about their situation for fear that they don't

17   have complete confidentiality that they ordinarily would have

18   with a mental health provider.

19        So, I think if Mr. Fabio is going to mental health

20   treatment on his own, and that person will be free to inform

21   probation that, yes, he is coming to treatment once a week or

22   twice a week, that that person is a documented licensed

23   provider, that that should be enough.  If he could be required

24   to continue the treatment with the person he chooses, and to

25   provide proof of that and ongoing proof of that to probation, I

1   think that should be enough.

2           MR. GIANFORTI:  Your Honor, briefly, if I may.

3           Just to provide a little additional clarity on this

4   condition.  My understanding from the probation officer is that

5   Mr. Fabio will be able to continue to use whatever therapist he

6   is currently using.  There is just a HIPAA form that the

7   therapist has to provide to probation.  The downside, I

8   suppose, for Mr. Fabio is that he has to pay for that

9   out-of-pocket.  So it sounds like a provider that he obtains

10  through a probation-approved program might be more beneficial

11  to him financially.  But just so it's clear, it's not like he

12  is being precluded from using his current therapist if he has a

13  good relationship with that therapist.

14          In terms of the waiver, I don't know what to say.

15  Supervised release is a restriction on his liberty.  I am

16  sorry.  He committed a crime.  And if he is going to go into

17  therapy and start disclosing additional criminal conduct,

18  that's fair game.  I'm sorry.  It's only a year and it's a

19  standard special condition.  And we are trying to chip away at

20  every little bit and piece of this supervised release, and I

21  don't think it's appropriate.

22          THE COURT:  Well, the purpose of this condition is not

23  for the government to discover information concerning

24  criminality.  It's to provide mental health treatment to

25  someone whose crime may have been triggered in some way, shape

P2L8FABS

1   or form by his mental health condition.  So I don't believe the

2   waiver is a mechanism for the government to hear all the dirt.

3          MR. GIANFORTI:  I am not suggesting that.  I am merely

4   saying that a waiver exists should something like that arise,

5   if there is a requirement to report or something.  I am not

6   saying we are actively going to be mining or subpoenaing this

7   man's therapist.  This is imposed in this court every single

8   day, and we are trying to chip away at it for no good reason.

9          MS. SCOLARI:  Your Honor --

10          THE COURT:  Hold on.  Look, these are special -- they

11   are supposed to be nonstandard.  They are not supposed to be

12   standard conditions.  They are treated as standard conditions,

13   and I think that what the Second Circuit has told us is that

14   they are not supposed to be treated as standard conditions,

15   that they should be tailored to the defendant and then further

16   justified by reference to the 3553(a) factors.

17          So, I think all Ms. Scolari is doing is suggesting

18   ways in which we can modify these provisions to match Mr.

19   Fabio's situation.  And what Ms. Scolari is saying is that she

20   is going to be there looking out for Mr. Fabio, and that he has

21   someone that he is using for outpatient mental health

22   treatment.  And so this condition may actually interfere with

23   his course of treatment in a way that maybe probation would

24   never do this, right, and that's what I am hearing, too, except

25   that if I put this into the judgment, then it's going to be

P2L8FABS

1    something that Mr. Fabio is going to follow because it is in

2    the judgment, and then I will have to modify the condition if

3    there is some deviation down the road, and that's unnecessary.

4          So, Ms. Scolari, as I understand it, what you're

5    suggesting is that Mr. Fabio will provide proof each month of

6    participation in an outpatient mental health treatment program

7    to the probation department, and the probation department will

8    evaluate whether that is sufficient.  If they deem it to be

9    insufficient, then you would not at that point disagree with

10   the condition.  Meaning you just want there to be a way for you

11   to show that he is participating in a program, and to the

12   extent that probation agrees that it is appropriate, then he

13   can proceed with that treatment.  If for whatever reason they

14   are not satisfied, then this condition would apply.  Right?

15         MS. SCOLARI:  That makes sense.  And if Mr. Fabio

16   can't afford treatment and is required, then obviously he will

17   go to his probation officer and say, I have this condition, I

18   can't afford my therapist anymore, can you connect me up with

19   somebody that I can go to for free?  But I think what Mr.

20   Gianforti doesn't understand, since he clearly has never been

21   in therapy, excuse me if he has, is that -- it's like your

22   relationship with your lawyer, you have to trust the person,

23   you have to have confidentiality.

24         THE COURT:  Hold on.

25         MS. SCOLARI:  I will withdraw it.

P2L8FABS

1          THE COURT:  Everyone needs to stop talking.

2          MS. SCOLARI:  Yes, your Honor.

3          THE COURT:  Ms. Scolari, you don't need to go after

4     anybody here.  I was agreeing with you and trying to impose the

5     condition that you are requesting.  So I don't think there is

6     anything more to really be said.

7          MS. SCOLARI:  You're right, your Honor.

8          THE COURT:  So the condition will be that Mr. Fabio

9     will provide proof on a monthly basis of participation in an

10    outpatient mental health treatment program to the probation

11    department.  The probation department will evaluate the

12    circumstances and if they deem it appropriate, Mr. Fabio will

13    be required to participate in an outpatient mental health

14    treatment program approved by the United States Probation

15    Office, and under those circumstances, he must continue -- in

16    any situation, he must continue to take any prescribed

17    medications unless otherwise instructed by his health care

18    provider.  And to the extent that he utilizes the services of

19    an outpatient mental health treatment program approved by the

20    United States Probation Office, he must contribute to the cost

21    of services rendered based on his ability to pay and the

22    availability of third-party payments.  The Court authorizes the

23    release of available psychological and psychiatric evaluations

24    and reports, including the presentence investigation report, to

25    the health care provider.

P2L8FABS

1          It is also recommended that Mr. Fabio be supervised by

2     his district of residence.

3          As to a fine, there is no fine.  I don't think that

4     that would be appropriate here as there is a limited ability to

5     pay, given the financial circumstances outlined in Ms.

6     Scolari's application.

7          There is no restitution sought.

8          As to forfeiture, Mr. Fabio shall forfeit to the

9     United States any and all property, real and personal, involved

10    in the said offense, or any property traceable to such

11    property, including but not limited to a sum of money in United

12    States currency representing the amount of property involved in

13    the said offense, specifically $2,100.  And I have a fully

14    executed consent preliminary order of forfeiture, dated

15    August 13, 2024, which I will enter on the docket.

16         There is also the special assessment of $100.

17         Do counsel know of any legal reason, other than those

18    already argued, why the sentence should not be imposed as

19    stated?

20         Mr. Gianforti.

21         MR. GIANFORTI:  No, your Honor.  But I believe the

22    probation officer was looking for a little clarification.

23         MS. GEISER:  Can you clarify on the record what type

24    of proof of evidence Mr. Fabio will provide to his supervising

25    officer?  Is that just a letter that he has attended or a

P2L8FABS

1    status report of his progress in treatment?

2              THE COURT:  To be clear, that is proof that meets the

3    probation department's requirements.

4              MS. GEISER:  So that would be up to the supervising

5    officer.

6              THE COURT:  Thank you for saying it better than I did.

7    Proof that is subject to -- say it again just so I get it

8    right.

9              MS. GEISER:  His progress and compliance for treatment

10   for the supervising officer.

11             THE COURT:  It will be proof of participation in an

12   outpatient mental health program subject to the discretion of

13   the assigned probation officer as to the sufficiency of that

14   proof.

15             MS. GEISER:  Thank you.

16             THE COURT:  All right.

17             Ms. Scolari, any reasons why the sentence cannot be

18   imposed at this time?

19             MS. SCOLARI:  No, your Honor.  Thank you.

20             THE COURT:  I order the sentence be imposed as stated.

21             Mr. Gianforti, there are open counts here?

22             MR. GIANFORTI:  Your Honor, there is not.  It's just

23   the information and it was on complaint before so there are no

24   underlying indictments.

25             THE COURT:  Mr. Fabio, to the extent you have not

P2L8FABS

1    given up your right to appeal your sentence through your plea

2    of guilty and the agreement you entered with the government in

3    connection with that plea, you have the right to appeal your

4    sentence.  If you're unable to pay the cost of an appeal, you

5    may apply for leave to appeal *in forma pauperis*.  You may also

6    apply for court-appointed counsel.  The notice of appeal must

7    be filed within 14 days of the judgment of conviction.

8            Is there any other objection that either side has that

9    I have not addressed?

10            MR. GIANFORTI:  Not from the government.

11            MS. SCOLARI:  No, your Honor.  Thank you.

12            THE COURT:  All right.

13            Mr. Fabio, all I want to say here is that, again, I

14    have not seen any case in which this many people have written

15    letters of support on behalf of somebody.  I think that your

16    circumstances have moved not only me here, but I think, really,

17    the one thing to think about is that everyone in this room is

18    really in your corner.  And when I read these letters, what

19    they showed me is that you're not just a good person who has

20    tried to live a law-abiding life except for this one incident.

21    You're someone who stood up for people who are vulnerable.  And

22    you supported your friends and family in times of need, and you

23    overcame so many tough circumstances in your upbringing and

24    your life, and you did it with a lot of perseverance.  And I

25    think that that perseverance is going to carry you forward

P2L8FABS

1    here.  And a lot of folks here in the back of the courtroom, I

2    think it's important for you to just remember the types of

3    things that they said about you, because they came out here to

4    support you not because they just felt like they had to, they

5    came out to support you because you deserve their support.  You

6    are someone who is worth their support.

7        Your friend Xavier Nogier wrote:  "His resilience and

8    commitment to moving forward, even in difficult circumstances,

9    reflect his ability to adapt and grow."

10       Your friend and coworker Storm Hill, she wrote:  "He

11   is someone who made me feel safe and seen.  He takes time to

12   get to know people for their heart and encourages them."

13       Sylvia Anderson, a friend, wrote:  "I have known Mr.

14   Fabio for over ten years, and during this time, I have come to

15   know him as a man of deep integrity, compassion, and a strong

16   commitment to his family and spirituality.  He is, without a

17   doubt, one of the most caring and selfless people I have ever

18   had the privilege to become friends with."

19       And your mother described you as a beautiful person.

20   "He is someone who has always been willing to help others, and

21   he never expects anything in return.  His generosity can be

22   seen in everything that he does.  It does not matter how small

23   or big the thing is."

24       Literally, everyone here in this courtroom and in

25   these letters are in your corner.  I really mean this.  You are

P2L8FABS

1    a good person.  And you have a strong community behind you.

2    You have a bright future ahead of you.  I know it seems really

3    dark right now and you're looking to this period of

4    incarceration, but it's going to end, and you're still going to

5    be that strong person that you are, and through the treatment

6    that Ms. Scolari is going to help you with, you are going to

7    get even better.  And I see it in these letters.  I see it in

8    the faces of the people in this courtroom.  I see it in you.

9    And if you ever need a reminder that this is the beginning and

10   not the end, and if you need a reminder that you are a good

11   person and that you can overcome this, just like you overcame

12   so many things in your life, then come see me.  Because I

13   really do mean that.  Okay?

14          Thank you very much.  I really appreciate it.

15          And we are adjourned.

16          (Adjourned)

17

18

19

20

21

22

23

24

25